STATE *vs.* BIG CHIEF CORPORATION.

MAY 7, 1940.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. This is a proceeding begun by indictment in which it is charged that the defendant corporation, at Providence, on June 21, 1938, "did set up, put forth, carry on, promote and draw publicly a lottery, chance, game and device, to wit, 'Bank Night', so-called, for the purpose of disposing of money", to wit, one hundred fifty dollars, in

violation of general laws 1923, chapter 401, sec. 1, which is now general laws 1938, chapter 612, § 1.

Jury trial having been waived, it was heard before a justice of the superior court, sitting without a jury, solely upon evidence set forth in a written statement agreed upon by the state and the defendant and entitled "Agreed statement of facts" and hereinafter referred to as the "agreed statement". This being a criminal proceeding, it is not governed by general laws 1938, chap. 545, § 4, for the certification of a civil action to this court by a district court or the superior court upon the filing of an agreed statement of facts. The justice filed a rescript, in which he found the defendant guilty; and the case is now before us on a bill of exceptions by the defendant, in which the only exception is to this decision, the ground of such exception being that the court erred in adjudging the defendant guilty.

The facts set forth in the agreed statement which are material in passing upon this exception are as follows: About 7:35 o'clock, p. m., on June 21, 1938, the defendant, which was and had been for a considerable period owner and operator of a market under the name of "Wilson's Chief Market", conducted a "bank night", so-called, on a tract of land in the city of Providence adjoining its market and used as a parking lot. This "bank night" was attended by about three thousand persons and a representative of the defendant was in charge of it.

Through a loud-speaking apparatus, he announced from a platform to the assembled crowd that the drawing for that evening was for a prize of $150 and that if that sum was not claimed in accordance with the rules governing bank nights, there would then be a second drawing for a prize of $50. For the first prize a young woman who was called up to the platform from the crowd drew, at random,

a numbered ticket from a cylinder containing several thousand such tickets. The number of that ticket was then looked up in a book containing the numbers and the names and addresses of the persons who held registration cards.

The name of the person who owned the ticket marked with that number was then announced from the platform as the winner of the $150 prize. The defendant's representative continued to repeat this announcement for three minutes, but nobody claimed the prize. The same procedure was followed as to the second prize of $50, with a similar result. The defendant's representative then announced to the crowd that on the next Tuesday evening at 7:30 o'clock there would be similar drawings for two prizes of $150 and $100 respectively.

All this procedure was in accordance with a plan known as "bank night", which the defendant was using under a license issued to it, for a consideration paid, by a certain corporation located in Boston. A copy of the rules and regulations governing the use of the plan formed a part of the agreed statement of facts in this case. So far as now material, these rules and regulations, which the defendant had followed in connection with a series of bank nights, were substantially as set forth in the next three paragraphs hereof, in which masculine pronouns are used as including the corresponding feminine ones.

To be eligible to participate in the plan as a possible recipient of a prize, a person must be more than fifteen years old and must first have registered by writing his name and address on a registration sheet, provided by the defendant at its store, and must have there received a registration card. The defendant sent solicitors to the homes or places of business of prospective participants, inviting them to register; and it had registration facilities in the market. No money had to be paid for registration, nor was anyone

participating in the plan required to buy anything at the market.

Drawings took place every Tuesday evening at the same place and time. The winner of a prize must appear and claim it within three minutes from the first announcement of the award to him and must identify himself. If a prize was not claimed by the winner within the three minutes, it was added to the amount to be awarded at the next bank night, in one or more prizes, no prize being more than $150 or less than $50; and this process would be continued indefinitely.

Then came the requirement that seems to us an important one in determining whether or not the proceedings under the plan were in violation of the statute of this state against lotteries. This requirement, as interpreted by the defendant, was that the winner, to be eligible to receive an award on any particular Tuesday, must have had his registration card "qualified" *at the defendant's market* on any business day before that Tuesday and *after the last preceding Tuesday*. The above were the only requirements for eligibility to receive a prize; and notice was given at prominent places in the market that every feature of bank night was free and that there was no charge of any kind.

On the night in question the defendant had over 17,000 names in the registration book. "It had an average of from 3000 to 12,000 people around its premises on bank night" according to the agreed statement, evidently meaning while it had been having bank nights. In the week prior to the night in question in this case, 5211 persons had qualified for participation in that bank night and during that week 161 new persons had registered for participation.

The plan of bank night was operated by the defendant to advertise its market and was designed to create public

interest in its market and thereby to increase attendance there, not only on the nights of its actual operation, but also on all other days of the week, and generally it had had that effect. The defendant had been conducting such bank nights for about twenty-six or twenty-seven weeks, every Tuesday evening.

The pertinent part of the statute involved in this case is as follows: "Every person who shall, directly or indirectly, set up, put forth, carry on, promote or draw, publicly or privately any lottery, chance, game or device of any nature or kind whatsoever, or by whatsoever name the same may be called, for the purpose of exposing, setting for sale or disposing of any money, houses, lands, merchandise or articles of value . . . shall be deemed guilty of a misdemeanor . . . ."

One of the first, if not the first reported case in which a question similar to the basic one in the instant case was decided is *Willis* v. *Young*, 1907, 1 K. B. 448, 3 British Rul. Cas. 973. In that case, in which the defendants, publishers of a newspaper, were prosecuted for conducting a lottery, they were found not guilty by the magistrate before whom the case was heard, the facts being undisputed. This decision was reviewed by the King's Bench Division and the defendants were held to be guilty.

In that case the defendants had distributed free a great many medals, each having a different number. Drawings of numbers were made at frequent intervals from the numbers on the medals outstanding; and those who held the medals bearing the numbers which were thus drawn received prizes. These winning numbers were published only in the defendants' newspapers, though anyone, without any expense, could find out which numbers these were by going to the defendants' offices; and no holder of a medal had to buy a newspaper or incur any expense in order to have

an equal chance with every other such holder to receive a prize. *While the scheme was in operation, the sale of the defendants' newspapers was greatly increased.*

Just as in the instant case, the contention was made that the scheme was not a lottery, because no scheme for a distribution of prizes by mere chance could be a lottery, within the meaning of that term in the criminal law, unless a valuable consideration was required from every one who received a chance to be awarded a prize, and in the case then before the court no such consideration was required.

After stating the facts and this contention, the chief justice who wrote the principal opinion said: "The money for the prizes, however, comes out of the receipts of the respondents, and these in their turn come, to a considerable extent, from the people who buy the paper, although no doubt the advertisements may bring in a considerable sum. The persons who receive the medals therefore contribute collectively (though each individual may not contribute) sums of money which constitute the fund from which the profits of the newspaper, and also the money for the prize winners in this competition, come."

All of the judges of the court concurred. In a separate opinion *Darling, J.* said: "I agree. But I wish it to be clearly understood that I am not prepared to hold that an absolutely free and gratuitous distribution of chances, none of which have been paid for, would be a lottery. In the present instance all chances are paid for in the mass by the general body of purchasers of the paper, although an individual purchaser may not pay for his chance. The person who distributes the chances is therefore paid if the sale of the newspapers be looked at as a whole, although some chances are given away."

The text-writers and reported cases on this subject seem to be in agreement upon the rule that three elements must

be present in order to constitute a lottery within the meaning of that word as used in the criminal statutes, and that these elements are a prize, chance, and consideration. *State v. Eames,* 87 N. H. 477, 183 A. 590.

In applying this rule the principal difficulty has been in deciding what meaning should be given to the word "consideration". One meaning that has been given in a good many cases is set forth in 17 R. C. L. 1222 as follows: "In regard to the element of consideration, it has been said that the species of lottery which is intended to be prohibited as criminal by the various laws of this country embraces only schemes in which a valuable consideration of some kind is paid, directly or indirectly, for the chance to draw a prize; and that the gratuitous distribution of property by lot or chance, if not resorted to as a device to evade the law, and if no consideration is derived directly or indirectly from the party receiving the chance, does not constitute a lottery." This statement of the law is quoted with approval in *Affiliated Enterprises, Inc.* v. *Gruber,* 86 Fed. (2d) 958 (C. C. A. 1st cir.)

It has been held in a few cases that the requirement of consideration is satisfied by any conduct which would constitute consideration for an executory contract. See, for instance, *Maughs* v. *Porter,* 157 Va. 415, 161 S. E. 242. But this holding is against the very great weight of authority and we do not follow it in the instant case.

On the contrary, we accept and apply the doctrine that the consideration, required as one of the necessary elements of a lottery within the meaning of that term as used in statutes forbidding lotteries, must be a consideration having a pecuniary value. *Commonwealth* v. *Wall,* (Mass.) 3 N. E. (2d) 28 (1936). The real difficulty in the instant case is in applying that rule.

That difficulty has been discussed and decisions reached in many cases in this country, the great majority being in connection with bank night schemes used to increase the paid attendance in moving picture theatres. There has been a practical uniformity of decisions that such a scheme is a scheme for a lottery, in the sense of that term in the criminal law, if chances to receive prizes awarded by lot are given only to persons who have paid for admission to the theatre.

This is the holding in such cases, even though there is no increase in the prices for admission on bank nights over those for other nights when the same or equally good pictures are shown. The defendant in the instant case does not deny the correctness of such a decision in such a case, and cites in its brief a typical case thus decided—*People* v. *Miller,* 246 App. Div. 825, 285 N. Y. S. 1079, affirmed in 271 N. Y. 44, 2 N. E. (2d) 38.

A like result has been reached in a number of cases, some of them being criminal prosecutions and others being suits for injunctions, in which chances for a prize have been given out in connection with sales of merchandise in stores and with sales of newspapers, even though there was no increase in prices. For examples see *State* v. *Mumford,* 73 Mo. 647; *Davenport* v. *Ottawa,* 54 Kan. 711, 39 P. 708; *Retail Section of Chamber of Commerce* v. *Kieck,* 128 Neb. 13, 257 N. W. 493.

After the original scheme of bank night, in which chances for prizes were restricted to persons who had paid for admission to the theatre in question, had been declared illegal in many states it was modified. The modification consisted in not restricting chances for a prize to those who paid for admission but allowing any person to have an equal chance by registering at the theatre on the night in question, without charge, and then being near enough, in the lobby of the theatre or outside, to claim, inside the theatre

and within the few minutes allowed for that purpose after the award had been announced, any prize awarded to him.

With this modification, because it was not required that anyone pay any money to the operator of the theatre in order to have a chance to win a prize, the scheme was, in many cases, held to be not a forbidden lottery.

On this ground it was upheld by the Monroe County Court in New York in *People* v. *Shafer,* 160 Misc. 174, 289 N. Y. S. 649. In that case the only requirement was the signing of a book in the theatre; and the court said, at page 177 (653): "In the case at bar there is no proof that any participant in the drawing paid a valuable consideration for participation in the drawing. On the other hand, there is definite proof in the record that participation was absolutely free." This decision was affirmed, without an opinion, by the court of appeals, 273 N. Y. 475, 6 N. E. (2d) 410, in a four to three decision.

In our judgment this ground has been considerably limited in some recent cases in other states. One of the first of these cases is *State* v. *Eames, supra.* There it was held that the modified bank night scheme in question, which was set forth in an agreed statement of facts, was not illegal. But before stating that decision and after finding that the scheme there in question was not governed by the previous cases holding illegal the unmodified bank night scheme, the court said, at page 480 (592): "On the other hand, the scheme did, in fact, result in a substantial increase in the sale of tickets of admission. It therefore falls near the border line between lotteries and gifts to recipients who are chosen by chance." A little further along in the same opinion the court said: "The problem presented by 'Bank Night', and similar schemes is to determine whether it is an evasion of the statute or an avoidance of it, and this question is essentially one of fact. In answering this question we do not propose to close our eyes to

reality. The test by which to determine the answer to this question is not to inquire into the theoretical possibilities of the scheme, but to examine it in actual, practical operation."

Another case of the same sort is *Commonwealth* v. *Wall, supra,* a Massachusetts case decided in 1936. There a conviction in a bank night theatre case was set aside because the trial justice had instructed the jury, in substance, that any technical and nonvaluable consideration, whether registration of the name or anything else, would be a sufficient price. At page 30 of 3 N. E. (2d) the court said that "a game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances . . . . So here the test is not whether it was possible to win without paying for admission to the theatre. The test is whether that group who did pay for admission were paying in part for the chance of a prize." A similar test seems to have been applied in a number of other cases.

A little further on, the court said: "We are also of opinion that the price must come from participants in the game in part at least as payments for their chances and that the indirect advantage to the theatre of larger attendance is not in itself a price paid by participants."

In *Affiliated Enterprises, Inc.* v. *Gantz,* 86 Fed. (2d) 597, (C. C. A., 10th. cir., 1936), an equity suit, the court denied the prayer of the complainant that the respondent be enjoined from using the modified form of the bank night scheme without the complainant's permission. The ground for the decision was that if the scheme was not within the literal definition of a lottery under the criminal law, it was too closely akin to it to have the protection and assistance of a court of equity.

The reasoning of the court was that the scheme would be utterly worthless as a money-making one, unless many

persons, who otherwise would not have bought admission tickets, did so in order to share in the chances for a prize; and that the feature of allowing persons under certain conditions, not including the payment of money, to participate in the chances for the prize seemed to be "a subterfuge to escape the stigma of being a lottery."

In *Grimes* v. *State*, 235 Ala. 192, 178 So. 73 (1937), the statute dealt with the carrying on of "any lottery or device of like kind, or any gift enterprise, or any scheme in the nature of a lottery or gift enterprise." The modified bank night scheme was held to violate this statute, the supreme court saying, on pages 193, 194, (74): "Is there a consideration within the spirit and purpose of our lottery laws? It should be kept in mind that the penal statute is directed to the operator. Is there a consideration moving to him? The very fact that it is a business enterprise intended to swell the receipts from paid admissions to the theatre evidences an intention to garner a profit from the gift enterprise. For practical purposes the measure of the consideration moving to him is the excess of receipts from paid admissions on bank nights, over what they would have been for the entertainment in the absence of the bank night attraction. . . . Obviously the increased income above noted must come from paid admissions. Paid for what? Paid for the chance to draw the prize or jack pot. . . . The results, the success of the plan in swelling the patronage, and consequent income through the scheme of chance are the final proof of a consideration paid and a consideration received."

So also, in *State* v. *Wilson,* 109 Vt. 349, 196 A. 757, (1938), the court, in holding the later form of the bank night scheme to be a lottery, applied the same test as was stated in *Commonwealth* v. *Wall, supra,* to be the correct test, and stated it in the same language. See also *Society Theatre* v. *Seattle,* 118 Wash. 258, 203 P. 21; *State* v. *Fox Kan-*

*sas Theatre,* 144 Kan. 687, 62 P. (2d) 929; *Cole* v. *State,* Tex. Cr. R. 548, 112 S. W. 133 (2d) 725; *State* v. *McEwan,* 343 Mo. 213, 120 S. W. (2d) 1098.

The court in the case of *Featherstone* v. *Independent Service Station Ass'n,* 10 S. W. (2d) 124, (Tex. Civ. App. 1928), a commercial case in equity, applied much the same test, but stated it somewhat more broadly. There gasoline service station proprietors gave out tickets for chances in a prize-drawing, one ticket for each dollar spent, and also gave out similar tickets freely to a number of other persons, for the purpose of promoting "good will". It was held that such free disposition of tickets did not prevent the scheme from being in violation of the statute against lotteries.

At page 127, the court said: "That the giving of tickets, and the drawings and distribution of prizes, were inducements to patronage and unquestionably lured customers, is shown from the very satisfactory business results that followed. Patronage thus induced was the consideration that passed from the ticket holder for the chance received, in that the price paid, whatever it was, the amount being immaterial, constituted the aggregate price for the merchandise or service and the ticket that represented a chance to win the prize; . . . the ticket being as much bought as though priced separately." The scheme was held to be a lottery.

It seems to us that this reasoning is much like that of the court of King's Bench in the first case above cited—*Willis* v. *Young, supra*—except that in the English case there was no aggregate price for the newspaper and the chance to win a prize, and the profit to the defendants was more indirect. The reasoning was much like that of the trial justice in the instant case. We are convinced that his decision cannot be supported at all, unless upon such reasoning. But this reasoning is based on certain premises; and

we need not decide whether or not it is sound, unless we first find that these premises are present in the instant case.

Here the number-bearing cards, from which the drawings for prizes were made, represented duly "qualified" registration cards, for which no money was paid. The only requirements for eligibility for a prize on a particular bank night were that a person must at some time have registered in person in the market of the defendant; that he must have had his card "qualified", by going in person to that market on any week day, except Tuesday, during the week immediately before that night and there having his registration card properly punched; and that he must be present in the crowd on the evening in question in the parking lot immediately adjoining the defendant's market. There was no requirement that any person, to be eligible for a prize, must have purchased any goods at the defendant's market.

It is set forth in the agreed statement that the scheme is designed to increase attendance in the stores of the licensees, not only on the nights of its operation but on all other days of the week; that generally it has had that effect; and that in the week just prior to the night involved in this case about 5211 persons had their registration cards "qualified" at the market of the defendant and 161 new persons registered there.

But the trial justice, in his rescript, found also, specifically or in substance and effect, that undoubtedly many persons who were present at the drawings on the evening of June 21 had bought merchandise from the defendant because they were brought to the market by their desire to register and to participate in the drawings and were led, either by their self-respect or by the attractiveness of the merchandise which they saw there, to make purchases; and that money was spent not only for merchandise but for the purpose of participating in the bank night.

If these findings had been sufficiently supported either by express evidence or by necessary deductions therefrom, they would have constituted the premises for the above-stated reasoning of the trial justice; and we then should have had to consider whether we should adopt and apply to the instant case the reasoning of decisions following *Willis* v. *Young, supra,* or those following a different line of authority.

But, in our judgment, there is not sufficient support, by the evidence contained in the agreed statement or by necessary deductions therefrom, for a finding that anybody paid any money "not only for merchandise but for the purpose of participating in Bank Night", or even for a finding that many persons had bought merchandise from the defendant because they were brought to the market by their desire to register and so participate in the drawings.

Therefore, even assuming that the decisions following *Willis* v. *Young, supra,* were correct—which we are not required to decide and do not decide—we must hold that the above-stated reasoning of the trial justice cannot be applied in this case, especially as guilt must be established beyond a reasonable doubt. For that reason and because the decision of the trial justice cannot be supported on any other line of reasoning which we consider sound, the decision is erroneous.

The defendant's exception is sustained, and the case is remitted to the superior court with direction to find the defendant not guilty.

*Louis V. Jackvony,* Attorney General, *James O. Watts,* Assistant Attorney General, for state.

*Hinckley, Allen, Tillinghast & Wheeler, S. Everett Wilkins, Jr.,* and *George S. Ryan* of Massachusetts Bar, for defendant.