**AMERICAN BROADCASTING CO., Inc. v.
UNITED STATES et al.**

**NATIONAL BROADCASTING CO., Inc. v.
UNITED STATES et al.**

**COLUMBIA BROADCASTING SYSTEM,
Inc. v. UNITED STATES et al.**

United States District Court
S. D. New York.

Feb. 5, 1953.

G. B. Zorbaugh, New York City, Cravath, Swaine & Moore, New York City (Alfred McCormack, George B. Turner and Charles Myneder, New York City, of counsel), for American Broadcasting Co., Inc.

Cahill, Gordon, Zachry & Reindel, New York City (Paul W. Williams, Gustav B. Margraf, Thomas E. Ervin and Dudley B. Tenney, New York City, of counsel), for National Broadcasting Co., Inc.

Rosenman, Goldmark, Colin & Kaye, New York City (Ralph F. Colin, Max Freund and Andrew J. Schoen, New York City, of counsel), for Columbia Broadcasting System, Inc.

Newell A. Clapp, Acting Asst. Atty. Gen., Myles J. Lane, U. S. Atty. for Southern Dist. of New York, and Nathan Skolnik, Asst. U. S. Atty., New York City, James E. Kilday and William J. Hickey, Special Assts. to the Atty. Gen., for the United States.

Benedict P. Cottone, Gen. Counsel, and J. Roger Wollenberg, Asst. Gen. Counsel, Washington, D. C., Daniel R. Ohlbaum,

Erich Saxl and Richard T. Conway, Washington, D. C., for Federal Communications Commission.

Before CLARK, Circuit Judge, and LEIBELL and WEINFELD, District Judges.

LEIBELL, District Judge.

These three actions were instituted in August 1949 to enjoin and set aside an order of the Federal Communications Commission adopting certain interpretative rules of the Commission in relation to "giveaway" programs on radio and television.[1] Jurisdiction of this three-judge court is based on the provisions of the Federal Communications Act, 47 U.S.C.A. § 402(a) and the United States Judiciary and Judicial Procedure Act, T. 28 U.S.C. §§ 1336, 1398 and 2284. The right to a judicial review of the action of the Federal Communications Commission is also asserted by the plaintiffs under Section 10 of the Administrative Procedure Act. 5 U.S.C.A. § 1009.

The report of the Commission, released August 19, 1949, is entitled "In the Matter of Promulgation of Rules Governing Broadcast of Lottery Information" and states in its opening paragraphs that:—

"The Commission has this day determined to adopt the attached interpretative rules, set forth in the appendix to this Report, to be designated as Sections 3.192, 3.292 and 3.692. These rules set forth for the guidance of all broadcast licensees and other interested persons the Commission's interpretation of Section 1304 of the United States Criminal Code (18 U.S.C. § 1304) prohibiting the broadcast of any lottery, gift enterprise, or similar scheme which the Commission intends to follow in licensing proceedings in determining whether an applicant for a station license or renewal thereof is qualified to operate his station in the public interest. A Notice of Proposed Rule Making concerning this subject was issued by the Commission on August 5, 1948 and a Supplemental Notice

---

1. A similar action was brought in the District Court for the Northern District of Illinois and a temporary restraining order issued on September 13, 1949.

of Proposed Rule Making was issued on August 27, 1948. Interested parties were afforded an opportunity to file briefs or statements setting forth why they believed the rules should or should not be adopted and oral argument on the matter was held before the Commission *en banc* on October 19, 1948."

The subsequent legal proceedings are summarized in the brief of defendants' counsel, in the American Broadcasting case, as follows:—

"The Commission's order provided that it would go into effect on October 1, 1949. On August 31, 1949, plaintiff filed its complaint in this action. On September 19, 1949, Judge Rifkind convened a statutory court consisting of Judge Clark, Judge Leibell and himself, and on September 23, 1949, having heard a motion by plaintiff for a temporary restraining order, Judge Rifkind issued a restraining order and set down the application for an interlocutory injunction for hearing before the three-judge court at a later date. That application, however, did not come on for hearing because, following Judge Rifkind's issuance of a temporary restraining order, the Commission on its own motion postponed the effective date of its proposed rules until 30 days after final decision in this and the co-pending actions.

"Following a number of discussions between counsel for the Commission and counsel for plaintiffs in the several actions, it was agreed that the cases could be and should be presented to the Court in a form not requiring a decision on questions of fact. For that purpose, amended complaints were prepared in the several actions and the amended complaint in the present action was filed on September 22, 1952. On the same day plaintiff moved on the complaint, a supporting affidavit and a stipulation with defendants' counsel, for summary judgment, and defendants filed a cross-motion for an order dismissing the complaint or, in the alternative, for summary judgment."

The stipulation in each action provided that all the allegations of the amended complaint be taken as admitted by the defendants and that either plaintiff or defendants may rely upon facts set forth in the amended complaint in the companion actions and upon any of the affidavits filed in either of said companion actions by either plaintiff or defendants therein.

The three-judge court was thereafter reconstituted by the designation of Judge Weinfeld in place of Judge Rifkind, who had resigned as a District Judge. The motions in the three actions were consolidated for argument and were argued on December 15th, 1952.

### The Pleadings and Motions.

The amended complaint of the American Broadcasting Company alleges jurisdictional facts and specifies the statutes under which the action is brought; it recites the adoption of the Rules by the Commission, the institution of the action, the parties thereto, the plaintiff's extensive broadcasting and television business and its large investment in broadcasting facilities for radio and television programs. Paragraphs 11 and 12 of American's amended complaint alleges:—

"11. Plaintiff has expended substantial sums of money in building up among the public, advertisers and broadcasting stations a valuable reputation and good will for the broadcasting stations it owns and operates and for the programs broadcast by its stations and furnished to affiliated stations for broadcasting by them. From time to time, plaintiff broadcasts programs having as the central feature the conduct of a contest in which prizes are awarded to the successful contestants. Such programs, or some of them, are within the terms of the Rules defining the types of programs which the Commission 'will in any event consider' as violations of Section 1304 of the Criminal Code, although none of such programs constitutes, or has been held by any court to constitute, a lottery, gift enterprise or similar scheme in violation of said Section. Such programs have not tended to demoralize or

degrade the listening and viewing public but on the contrary have provided information and entertainment for the public. Many persons listen to, view and enjoy such programs although for one reason or another they are not eligible to win a prize. Such programs are highly popular, have contributed substantially to the reputation of and good will of plaintiff's stations and those affiliated with it and have produced substantial revenues and profits for plaintiff.

"12. Among such programs which are or may be within the terms of the Rules, and which we are informed and believe the Commission considers as coming within the Rules, are the following:

" 'Stop The Music' (radio show)

" 'Stop The Music' (television show)"

The amended complaint further alleges that unless the Commission's Order and the Rules be permanently enjoined and set aside, plaintiff's applications for renewal licenses for its broadcasting stations and for permits or licenses to extend its system will automatically be denied and its investments will be destroyed; or in any event plaintiff will be forced to discontinue the broadcasting of programs which may be within the Commission's Rules and plaintiff will suffer irreparable injury; that the Order and Rules are beyond the jurisdiction and authority of the Commission, violate the provisions of the Administrative Procedure Act, and are illegal and void; that the Rules are in violation of certain provisions of the Constitution of the United States and of the amendments thereto.

The prayer for relief asks that a three-judge court be constituted to hear and determine the action; that plaintiff be granted an interlocutory injunction; and that upon final hearing and determination of this action, the court "enter a decree permanently enjoining, setting aside and annulling said Order of the Commission adopted August 18, 1949, and the Rules adopted thereby".

Annexed to the amended complaint of the American Broadcasting Company is a description of its "Stop The Music" program—the radio version and the television version. The contestants are of two kinds: telephone participants and studio participants. The telephone participants are selected by lot or chance from telephone directories. The telephone participant is not required to be listening at his radio to the broadcast at the time he is called. If the telephone participant fails to identify the melody, a studio participant is given an opportunity to do so. The prizes are furnished by the manufacturer, in return for a brief advertisement of his product. Those who are selected from the television audience express in advance, through postcards, their desire to participate. From the cards received a random selection is made and the participants are telephoned.

An affidavit of G. B. Zorbaugh, Secretary and Acting General Attorney for American, is submitted in support of American's motion for a summary judgment. Annexed to it are many exhibits which are also annexed to the affidavits submitted by National or Columbia. They will be hereinafter considered. But one thing should be noted now. The Solicitor of the Post Office Department in a letter of May 9, 1949 advised American that the postcard in relation to the "Stop The Music" program would not be regarded as unmailable matter under the postal lottery statute. He added that whether or not the program conflicted with Section 1304 would be for the Federal Communications Commission to determine.

Further, in May 1949 the Solicitor of the Post Office sent the attorneys for the Columbia Broadcasting System a copy of a general ruling made by the Solicitor for the benefit of all the postmasters, in February 1947, from which the following is quoted:

"In order for a prize scheme to be held in violation of this section, it is necessary to show (in addition to the fact that the prizes are awarded by means of lot or chance) that the 'consideration' involves, for example, the payment of money for the purchase of

merchandise, chance or admission ticket, or as payment on an account, or requires an expenditure of substantial effort or time. On the other hand, if it is required merely that one's name be registered at a store in order to be eligible for the prize, consideration is not deemed to be present. (P. O. Bulletin February 13, 1947)."

The amended complaint of the National Broadcasting Company alleges the jurisdictional basis of the action; the order and rules of the Federal Communications Commission; the extent of the National Broadcasting Company's radio and television network; the annual income from the programs of National Broadcasting Company that would be affected by the Commission's Order and Rules; and a description of its four programs thus affected. "You Bet Your Life" is a studio audience participation program; "The $64 Question" is also a studio program; "What's My Name" is a studio and listening audience program; and "Double or Nothing" is a program in which the primary participation is by members of the studio audience, although members of the listening audience are invited to submit questions on a label of one of the sponsor's products. On the "What's My Name" program there is a selection at random of participants from the listening audience.

The amended complaint alleges the importance of these programs to National Broadcasting Company and the danger to it of a loss of its license when it is up for renewal, if the Commission enforces its rules in relation to Section 1304 of the United States Criminal Code. There are also allegations that the Commission is without power to promulgate or enforce the rules; that they incorrectly interpret Section 1304; that the rules violate provisions of the Communications Act and the Administrative Procedure Act; and finally that they are unconstitutional under the First, Fifth and Sixth Amendments, and under Clause 3 of Section 9 of Article 1 (Bill of Attainder). The prayer for relief asks that after final hearing, the three-judge court adjudge and decree that the Commission's Order is beyond the lawful authority of the Commission, in violation of plaintiff's legal rights and wholly void; and that the Commission's Order be vacated and set aside and the enforcement thereof perpetually restrained and enjoined. Annexed to the amended complaint are the scripts of the National Broadcasting Company programs mentioned above.

To the affidavit submitted by Mr. Margraf, Vice President and General Attorney of National Broadcasting Company, on the motion for summary judgment, there are a number of exhibits annexed, among them the following: a copy of Chairman Fly's letter of December 30, 1943, addressed to Senator Wheeler, then Chairman of the Interstate Commerce Committee, asking that he support certain legislation (draft enclosed) directed at radio programs "where members of the radio audience not in the studio are selected by lot or chance to win a prize if they can show that they were listening to the particular program". The draft of the proposed new Section 316 would have prohibited the broadcasting of "any program which offers money, prizes or other gifts to members of the radio audience (as distinguished from the studio audience) selected in whole or in part by lot or chance".

Mr. Margraf's affidavit also annexes copies of letters sent by the Commission's Chairman to the Attorney General's office in February and March 1940, calling his attention to the following programs "alleged to be in violation of Section 316 of the Communications Act of 1934." The "Meads Bakery Mystery Woman" program; the "Pot of Gold" program; the "Dixie Treasure Chest" program; the "Sears Grab Bag" program; the "Especially for You" program; the "Musico" program; the "Songo" program. On April 20, 1940, the Attorney General wrote the Commission that after a thorough examination of the material submitted, the Department had concluded that prosecutive action under Section 316 should not be instituted in the matter of the "Pot of Gold" and "Meads Bakery" programs. On April 29, 1940, the Attorney General wrote the Commission that after careful consideration no action was warranted by the Department in the "Dixie Treasure Chest" program. On the same day similar

letters were sent by the Attorney General to the Commission in respect to the "Sears Grab Bag" program, the "Especially for You" program, the "Songo" program and "Musico".

Mr. Margraf's affidavit also annexes documents showing that in 1939 the Solicitor of the Post Office made two contradictory rulings with respect to whether a radio program, known as "Musico", was a lottery. On July 1, 1939 he ruled that the program did not violate the Federal lottery laws. On September 29, 1939, he ruled that the "Musico" program did violate the Federal lottery laws. When the attorneys for Columbia Broadcasting System inquired in 1949 about those two rulings, the Solicitor of the Post Office replied on May 3, 1949: "It is likely that if the Musico plan were submitted to this office today, it would be held, in view of the change reflected in the enclosed notice (a general ruling for all postmasters concerning prize activities dated February 13, 1947) not to conflict with the postal lottery laws." The Solicitor also ruled on March 2, 1950 concerning the radio program "Truth and Consequences" that the contest post cards were mailable, although they were used for a random selection of contestants. The Commission had issued its proposed interpretative rules in August 1949.

The amended complaint of the Columbia Broadcasting System alleges the statutory provisions under which this action was instituted; the corporate organization of plaintiff; and the nature and extent of plaintiff's nationwide radio network and television network. It also alleges that "Sing It Again" and "Hit the Jackpot" are two network programs which involve the award of prizes; the revenue those programs produce; how the contestants from the listening audience are selected at random from phone books; and that on the "Hit the Jackpot" program studio contestants were selected by pre-broadcast interviews and non-studio contestants were selected by chance from post cards sent in. It is alleged that because of the Commission's Rules, sponsors have discontinued the programs; that there never has been any court adjudication that these programs violate Section 1304 of the United States Criminal Code; and that there is no finding of fact by the Commission that the said program or programs similar thereto "have had a demoralizing or other deleterious, harmful or evil effect on the public". The amended complaint further alleges that plaintiff's stations have a value of many millions of dollars which will be destroyed if its licenses therefor are not renewed. Finally, it is further alleged that the Commission's Rules do not correctly interpret and apply Section 1304 of the United States Criminal Code; that they violate provisions of the United States Constitution and amendments thereto; that they violate other statutes of the United States (the Communications Act and the Administrative Procedure Act); and that plaintiff will suffer irreparable damage unless it is accorded relief in this action. The prayer for relief seeks a permanent injunction and a judgment setting aside the Commission's order of August 18, 1949 and the rules adopted thereby.

Annexed to the amended complaint are transcripts of the program "Sing It Again" and of the program "Hit the Jackpot"; also copies of the Commission's Order, Opinion and Rules.

In support of its motion for summary judgment the Columbia Broadcasting System, Inc. submits an affidavit of Mr. Freund, one of plaintiff's attorneys, to which he annexes copies of the judgment (November 1939) in the case of Clef, Inc. v. Peoria Broadcasting Company in the Circuit Court of Peoria County, Tenth Judicial District, Illinois. That judgment held that the radio program "Musico" was not a lottery and did not violate any statutes of the United States. Mr. Freund also refers to various rulings of the Post Office Department, and to the opinions of the Attorney General in April 1940 in relation to a number of radio programs which were submitted by the Federal Communications Commission to the Department of Justice for action under Section 316 of the Communications Act. All of these programs were listed and discussed in the affidavit submitted by the National Broadcasting Company on its motion. The Commission's

letter to Senator Wheeler dated December 30, 1943, is also referred to.

In each of the three actions *the defendants* filed no answer but made a counter motion for an order dismissing the amended complaint of the plaintiff or, in the alternative, directing that summary judgment be entered in favor of the defendants. The ground for the motion to dismiss the amended complaint is that "plaintiff fails to state a claim upon which relief can be granted". The ground of the motion for summary judgment is that the amended complaint and its exhibits, the affidavit and other papers show that there is no genuine issue as to any material fact and that the defendants are entitled to judgment as a matter of law. Defendants' motion in each action was supported by an affidavit of the Commission's general counsel in which he recites the various steps taken preliminary to the adoption of the rules. The affidavit states that "oral argument was held before the Commission en banc" and that "Commissioners Coy, Chairman, Hyde and Jones did not participate in the adoption of the Report and Order of August 19, 1949, and Commissioner Hennock dissented from its adoption". He also states that the United States District Court, in the Northern District of Illinois, and this Court, having decided to issue restraining orders, "The Commission, on September 21, 1949, issued an order postponing the effective date of said rules until at least thirty days after the ultimate determination of these actions".

The general counsel's affidavit further states:—

.."4. Plaintiff broadcasts one or more programs which contain features comprehended by one or more of the rules in issue in this case. After such rules become effective, the failure of plaintiff to discontinue the broadcasting of any or all of such programs would result in setting for hearing applications for renewal of licenses filed by plaintiff and, upon a finding that such programs have been or will continue to be carried, such applications would be denied in accordance with the policy set out in the rules in issue."

In defendants' notice of motion in the National Broadcasting Company action, defendants also ask that this court strike paragraphs 13, 14 and 16 of the amended complaint in that action, on the ground that "the programs described in paragraphs 13, 14 and 16 of the amended complaint are not within paragraph (b) of the rules in issue and these paragraphs are therefore immaterial and impertinent". National Broadcasting Company does not oppose defendants' motion to strike the paragraphs and for that reason the motion will be granted.

### The Lottery Statute

Section 1304 of Title 18, the United States Criminal Code, provides:

"§ 1304. Broadcasting lottery information

"Whoever broadcasts by means of any radio station for which a license is required by any law of the United States, or whoever, operating any such station, knowingly permits the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes, shall be fined not more than $1,000 or imprisoned not more than one year, or both.

"Each day's broadcasting shall constitute a separate offense. June 25, 1948, c. 645, 62 Stat. 763."

Said section 1304 is one of five sections, §§ 1301 to 1305, which constitute "Chapter 61—Lotteries" of Title 18. Section 1301 deals with "Importing or transporting lottery tickets"; Section 1302, with "Mailing lottery tickets or related matter"; Section 1303, with "Postmaster or employee as lottery agent"; Section 1304, with "Broadcasting lottery information"; and Section 1305, with "Fishing contests".[2]

2. The reviser's notes on these sections in connection with the 1948 Congressional revision of the United States Criminal Code, show that Sections 1301, 1302 and

■ The Federal lottery statute does not define a lottery. The term "lottery" should be given its usual or popular meaning.[3] Since it was part of the Federal Criminal Statute for so many years before the Federal Communications Act was adopted in 1934, the term "lottery" should, in interpreting Section 316 of the Federal Communications Act, be given the interpretation which it had received in cases construing former Section 336 of the Federal Criminal Code.[4] Brown v. Duchesne, 19 How. 183, 60 U.S. 183, 15 L.Ed. 595; Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199; Van Beeck v. Sabine Towing Co., 300 U.S. 342, 57 S.Ct. 452, 81 L.Ed. 685; N. L. R. B. v. John W. Campbell, Inc., 5 Cir., 1947, 159 F.2d 184.

#### Adoption of the Commission's Interpretative Rules.

The interpretative rules in relation to Section 1304 of the United States Criminal Code, which the Commission adopted August 19, 1950, read, as follows:

"*Lotteries and Give-Away Programs*—(a) An application for construction permit, license, renewal of license, or any other authorization for the operation of a broadcast station, will not be granted where the applicant proposes to follow or continue to follow a policy or practice of broadcasting or permitting 'the broadcasting of any advertisement of or information concerning any lottery, gift, enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme, whether said list contains any part or all of such prizes.' (See 18 U.S.C. § 1304).

"(b) The determination whether a particular program comes within the

1303 are basically similar in language to corresponding provisions of the 1909 Revision. Section 1304 is practically the same as Section 316 of Title 47 U.S.C. (the Communications Act) which was adopted in June 1934.

The four sections (§§ 1301–1304 incl.) use the same terminology—"any lottery, gift enterprise, or similar scheme offering prizes dependent in whole or in part upon lot or chance". Section 1304 in another respect also uses the same terminology as Section 1302 which prohibits the mailing of "any newspaper, circular, pamphlet, or publication of any kind containing any advertisement of any lottery" etc. Section 1302, according to the 1948 Reviser's Note, was derived from R.S. § 3894 and various Acts dating back at least to 1876. It may be assumed that when Section 316 of the Federal Communications Act was originally enacted in 1934 as part of the Federal Communications Act, it was modeled on the U. S. Criminal Code provision against mailing lottery tickets and related matter (former § 336, U.S.Criminal Code). In fact a prosecution under the mailing statute (former § 336) was sustained where, as a result of advertising by radio broadcast, the mails were used in furtherance of a lottery. Horwitz v. United States, 5 Cir., 1933, 63 F.2d 706.

Section 1305 was not adopted until August 16, 1950. The Congress was prompted to adopt said section because the Postmaster General had ruled that "publications containing advertisements of fishing contests involving the three elements of prize, consideration, and chance" were unmailable under the lottery laws. The contestants were required to pay an entry fee. The Legislative History of Section 1305, U. S. Code Congressional Service, 81st Congress, Second Session, 1950, Vol. 2, p. 3010, shows that the House of Representatives' Committee favored the Bill because it was their "considered judgment that Congress, in enacting the lottery laws, never envisaged their application to such innocent pastimes as the typical fishing contest, which has a solid basis of respectability and wholesomeness far removed from the reprehensible type of gambling activity which it was paramount in the congressional mind to forbid."

3. Old Colony R. Co. v. Commissioner, 284 U.S. 552, 561, 52 S.Ct. 211, 76 L.Ed. 484; 54 C.J.S., Lotteries, §§ 1 and 18, pp. 843 and 862, citing cases.

4. A "gift enterprise" is one in which the purchaser of an article is given a chance to win a prize. 54 C.J.S., Lotteries, § 4, p. 850. When a gift enterprise involves the essential elements of a lottery (chance, consideration, a prize) it is unlawful. Matter of Gregory, 219 U.S. 210, 31 S.Ct. 143, 55 L.Ed. 184.

provisions of subsection (a) depends on the facts of each case. However, the Commission will in any event consider that a program comes within the provisions of subsection (a) if in connection with such program a prize consisting of money or thing of value is awarded to any person whose selection is dependent in whole or in part upon lot or chance, if as a condition of winning or competing for such prize:

"(1) such winner or winners are required to furnish any money or thing of value or are required to have in their possession any product sold, manufactured, furnished or distributed by a sponsor of a program broadcast on the station in question; or

"(2) such winner or winners are required to be listening to or viewing the program in question on a radio or television receiver; or

"(3) such winner or winners are required to answer correctly a question, the answer to which is given on a program broadcast over the station in question or where aid to answering the question correctly is given on a program broadcast over the station in question. For the purposes of this provision the broadcasting of the question to be answered over the radio station on a previous program will be considered as an aid in answering the question correctly; or

"(4) such winner or winners are required to answer the phone in a prescribed manner or with a prescribed phrase, or are required to write a letter in a prescribed manner or containing a prescribed phrase, if the prescribed manner of answering the phone or writing the letter or the prescribed phrase to be used over the phone or in the letter (or an aid in ascertaining the prescribed phrase or the prescribed manner of answering the phone or writing the letter) is, or has been, broadcast over the station in question."
[By the words "winner or winners" as used in paragraphs (1), (2), (3) and (4) of

subdivision (b), the Commission intended to include "contestants", according to the Commission's counsel.]

Paragraph (a) incorporates the language of Section 1304. Paragraph (b) (1) applies to a "prize enterprise" as well as a lottery.

The proposed Rules were considered at a hearing of the full Commission at which these plaintiffs and other interested parties were present, on notice. The hearing afforded the plaintiffs an adequate opportunity to present the grounds of their objections in both oral argument and briefs, and they availed themselves of that opportunity. Exhibit "A", consisting of two bulky volumes submitted by the Government on these motions, shows how widespread and varied were the sources and contents of the responses received by the Commission concerning the proposed rules, and the comments of the various publications in relation thereto.

It was not necessary for the Commission to take testimony before adopting the Rules. The procedure followed by the Commission was appropriate for the matter under consideration. The rule-making power was exercised through a procedure that conformed to the Administrative Procedure Act. T. 5 U.S.C.A. § 1003(b). The Commission was not adjudicating any controversy which would require a hearing and the application of trial procedure. That might come later, in a specific case, when an application for a renewal license would be under consideration.

Rule-Making Power of the Commission.

 The Communications Act specifically empowers the Commission to "make such rules and regulations, and issue such orders, not inconsistent with this chapter, as may be necessary in the execution of its functions" T. 47 U.S.C.A. § 154(i); and Section 303(r) grants the Commission the same rule making power "to carry out the provisions of this chapter". The Commission had the authority to make orders, rules and regulations in relation to broadcasting programs to implement the provisions of Section 1304 of Title 18 U.S.C. (formerly § 316 of the Federal Communications Act),

and could proceed by general rule or by individual ad hoc decisions in its discretion. Securities & Exchange Comm. v. Chenery Corp., 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995. The Commission did not have to await a judicial determination declaring a certain type of program to be in violation of said sections before formulating its Rules. But the Rules could not declare certain types of programs to be lotteries, if as a matter of law they were not lotteries and would not constitute a violation of said sections. The authority to make rules is not the power to make law. Lincoln Electric Co. v. Commissioner of Int. Rev., 6 Cir., 1951, 190 F.2d 326.

■ The rules as adopted, constituted a warning to all existing licensed broadcasting stations that, if their "give-away" programs violated the new rules, that fact would be considered by the Commission when the stations made application for a renewal of their licenses. Under Section 307 of the Communications Act of 1934, as amended, no broadcasting license may be granted for more than three years or for more than five years in the case of other licenses. License renewals are similarly limited. An applicant for a renewal license is entitled to a hearing on his application. § 309(a) of the Act. The Commission may refuse to renew a license for a violation of any regulation authorized by the Act. § 312(a). The refusal to renew a license for a violation of the Commission's rules is in effect a sanction to enforce compliance with the rules, but it is a proper exercise of the Commission's power if the station has deliberately violated a rule of the Commission which had been duly promulgated and was within the scope of the Commission's rule-making powers. Section 9(a) of the Administrative Procedure Act, prohibiting unauthorized sanctions, does not apply. Regents of University System of Georgia v. Carroll, 338 U.S. 586, 70 S.Ct. 370, 94 L.Ed. 363. In any specific case the station would have the right to a court review of any order of the Commission declining to renew the station's license. § 402 of the Act. But the enforcement of the Rules, by the refusal of a renewal license, would be a drastic penalty and sanction. Columbia Broadcasting System v. United States, 316 U.S. 407, 418, 62 S.Ct. 1194, 86 L.Ed. 1563.

■ Plaintiffs' counsel argue that these rules in relation to "give-away" programs are neither "necessary in the execution of its (the Commission's) functions", nor "necessary to carry out the provisions of this Act (the Federal Communications)". If it is a function of the Commission to determine who are properly qualified to operate broadcasting and television stations and to receive licenses or renewal licenses therefor T. 47 U.S.C.A. § 303 and § 309, rules stating the required qualifications are necessary to the execution of that function of the Commission; and if under the provisions of the Act the Commission is required to pass upon applications for licenses and license renewals, § 303 and § 309, rules barring applicants who would broadcast programs which would be in violation of a statute are necessary to carry out the provisions of the Act. Even though it may not be a function of the Commission to enforce the criminal law, the Commission would have the power to bar any applicant who violated the criminal law. Section 1304 of the United States Criminal Code is so closely identified with the field in which the Commission functions that at one time it was part, § 316 of the Federal Communications Act. The "public interest, convenience or necessity" standard for the issuance of licenses to broadcasting companies would imply a requirement that the applicant be law-abiding. Although Congress by a specific enactment authorized the Postmaster General to deny the use of the mails to lotteries and gambling schemes, 39 U.S.C.A. § 259 and § 732; Public Clearing House v. Coyne, 194 U.S. 497, 24 S.Ct. 789, 48 L.Ed. 1092, it was not necessary that Congress specifically authorize the Commission to take action against a broadcasting company which violated Section 1304 of the Criminal Code because the licensing power, specifically conferred on the Commission under Sections 303 and 309 of the Act, would include that authorization.

It is also urged by plaintiffs that Section 326 of the Act withholds from the Commis-

sion "the power of censorship" and bars the issuance of "any regulation which shall interfere with the right of free speech by means of radio communications" and that therefore the Commission was without the authority to issue these rules as to give-away programs. As will be shown later, the media of free speech are not above the provisions of the criminal law enacted for the protection of the general public; and the press, when using the mails, is barred under Section 1302 of Title 18 United States Code from doing the same things that broadcasting stations are prohibited from doing under Section 1304.

The Commission's Rules [(b) (2), (3) and (4)] would apply to programs that are not crimes under Section 1304 of Title 18.

A criminal statute must be strictly construed, even though it may be remedial in its nature and its purposes are to protect the general public. United States v. Halseth, 342 U.S. 277, 72 S.Ct. 275, 96 L.Ed. 308; United States v. McGuire, 2 Cir., 1933, 64 F.2d 485. Rules of the Commission which are based on a criminal statute should likewise be strictly construed, especially where they are supported by a penalty and sanction more drastic than fines. Columbia Broadcasting System Inc. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563. The Rules cannot go beyond the Statute which they seek to implement. If the statute ought to be expended to include give-away programs, that is solely within the province of Congress. United States v. Williams, 341 U.S. 70, 71 S.Ct. 581, 95 L. Ed. 758.

The plaintiffs' attorneys argue that the Rules fail to conform to the legal definition of a lottery, and that the Commission has erroneously interpreted Section 1304 of the United States Criminal Code. "The essence of a lottery is a chance for a prize for a price". Commonwealth v. Wall, 295 Mass. 70, 3 N.E.2d 28, 29. The specific programs under attack by the government in these three actions offer prizes, and at least some of the contestants for the prizes are selected by lot or chance. In some instances, from the thousands of radio listeners a number of contestants are selected by the spinning of a wheel, which first determines the number of a phone book; next a page thereof; and finally a name and phone number on that page. The telephone number is then called and if the person answering is at the time listening to the program, or is able to give a "password" or an answer previously disclosed on the program, he becomes one of the contestants for the principal prizes. Even if he does not win, he receives a consolation prize on some programs. On television programs, the contestants, in some instances, are selected from the invisible audience at random, from postcards sent in by prospective contestants.

The contestants selected from studio audiences are usually interviewed in advance. Their qualifications are considered by the management before the selection is made. Where the contestants on the program come solely from the studio audience and they are not selected by chance, it would seem that an essential element of a lottery is lacking. Where some of the contestants are selected by telephone calls in the manner above described, the Commission contends that the element of chance is involved in their selection. I agree with that contention.

The act of listening to a broadcast of a "give-away" program, or viewing it on television, does not constitute a "price" or "valuable consideration", which is an essential element of a "lottery".

Besides the offer of a prize, and the presence of the element of chance in selecting some of the participants who will contest for the prize, it must also be shown, in order to constitute a lottery, that a price, something of value, is furnished by at least some of the participants. The Commission contends that something of value is furnished by the prospective participants because they become part of an invisible audience, which in the aggregate is a thing of value to the station broadcasting the program and to the advertiser who sponsors the program. To the station, because it can sell the program and its audience to an advertiser; to the advertiser, because he can use the program as a ve-

hicle for "commercials" pushing the sale of his merchandise.

We may assume that when a manufacturer becomes a sponsor for a radio or television program, the amount he will pay for it will depend upon its popular appeal, the size of the invisible audience it is likely to attract. The features of a program that have a special appeal may be many and varied. It would be a mistake to assume that every one who listens to the program on the radio or views it on television, does so in the hope that he may receive a telephone call to act as a participant and win a prize; but that many may harbor that hope is probably true, otherwise that feature of the program would not be included. If it adds to the value of the program for a sponsor it has a money value to the broadcasting station.

■ It is not the value of the listening participants to the station or sponsor that is the valuable consideration contemplated by the lottery statute. Griffith Amusement Co. v. Morgan, Tex.Civ.App., 98 S.W.2d 844. It is the value to the participant of what he gives that must be weighed. People v. Cardas, 137 Cal.App. Supp. 788, 28 P.2d 99. What do the prospective participants give? The Commission argues that it is a "legal detriment" to the listener or viewer to sit at home listening to the program and awaiting a telephone call from those in charge of the contest. Technically, and applying the law of contracts, that may be true. But that is not sufficient where a lottery statute, a criminal statute, is involved. The alleged

legal detriment to the radio listener is not the kind of a "price" or "thing of value" paid by a participant in a lottery, which the law contemplates as an essential element of a lottery. Commonwealth v. Wall, 295 Mass. 70, 3 N.E.2d 28; State ex rel. Stafford v. Fox Great Falls Theatre Corp., Mont., 132 P.2d 689; People v. Burns, 304 N.Y. 380, 107 N.E.2d 498. There are cases to the contrary, see footnotes in 54 C.J.S., Lotteries, § 2, on page 848, but this seems the more reasonable view.

Counsel for the government state that of the decided cases, the one that most closely approaches the factual situation of the "give-away" programs is Maughs v. Porter, 1931, 157 Va. 415, 161 S.E. 242. In that case defendant, an auctioneer, in order to attract a large audience, advertised that everyone who attended the auction sale, whether he bid thereat or not, would be given a chance on an automobile. Plaintiff attended the sale, received a number and her number was drawn as the winner of the automobile. The defendant refused to deliver the car to plaintiff. She sued. The defense of lack of consideration for the promise of defendant was resolved in plaintiff's favor, the court holding that attendance at the sale, which plaintiff was not legally obligated to attend, was a legal consideration. But the court went on to say that it was also a consideration furnished by plaintiff as a participant in a lottery and since a lottery was illegal under the laws of Virginia, the agreement was unenforceable. That case has been criticized in the Law Reviews.[5]

5. The Virginia Law Review (18 Va. Law Review 465) expressed the view that the general concept of the kind of valuable consideration, as an element of a lottery, was a monetary or a pecuniary consideration. The University of Pennsylvania Law Review (80 U. of Pa. Law Review 744) thought that the Virginia court erred in the Maughs case when it held that plaintiff's attendance at the auction was sufficient consideration for the ticket for the drawing of the automobile, in so far as a lottery statute was concerned. The article states: "But it does not follow that a consideration sufficient to support a contract is necessarily the kind of consideration contemplated by the statute prohibiting lotteries." The Harvard Law Review (45 Harvard Law Review 1206), in a note on the type of consideration requisite as an essential element of a lottery, states: "Money, of course, satisfies this requirement. The amount is unimportant; a cent is enough; the money need not even be legal tender. Other property with monetary value serves as consideration, and services would also be adequate. Usually the presence of consideration is obvious". In commenting on the Maughs case, a footnote in the article states:—"In any event, the purpose of the lottery laws is to prevent people from giving up money or money's worth in the hope that chance

Courts of other states have not followed the Maughs case. In Darlington Theatres v. Coker, 190 S.C. 282, 2 S.E.2d 782, 788, the Supreme Court of South Carolina stated that Maughs v. Porter was not in accord with "the general current of authority in America". In State v. Big Chief Corp., 64 R.I. 448, 13 A.2d 236, the Supreme Court of Rhode Island held that Maughs v. Porter was against the great weight of authority. In State of Kansas ex rel. Beck v. Fox Kansas Theatre Corp., 144 Kan. 687, 62 P.2d 929, the Supreme Court of Kansas referred to Maughs v. Porter as representing an "extreme instance of the feature of consideration". And in People v. Shafer, 160 Misc. 174, 289 N.Y.S. 649, the court considered Maughs v. Porter as not controlling and as having been subject to severe criticism. The Shafer case was later affirmed by the New York Court of Appeals, 273 N.Y. 475, 6 N.E.2d 410.

A recent case in this Second Circuit, Garden City Chamber of Commerce Inc. v. Wagner, D.C., 100 F.Supp. 769; 192 F.2d 240; D.C., 104 F.Supp. 235 appears to be very much in point. In that case the defendant, Postmaster of Garden City, refused to allow certain postal cards to be transmitted through the mails on the grounds that they were part of a lottery scheme. The plaintiffs sought an injunction against the Postmaster. In describing the scheme, designated as a treasure hunt, Judge Byers stated that it involved the following steps [100 F.Supp. 770]:

"(a) Each recipient of a card detaches therefrom a removable coupon bearing the same printed number as does the card itself. The sender retains the coupon, and (b) after mailing the card to the Chamber of Commerce, he (c) looks into the shop windows of the storekeepers who participate in the plan. (d) If he sees his number attached to an article dis-

played in one of those windows, he enters the store, presents his coupon, and receives that article."

The Judge then concluded:

"Manifestly this is a joint effort to promote window shopping, which hitherto has not been deemed even faintly illegal or immoral."

Judge Byers further concluded that the Solicitor for the Post Office had "ruled that to be a consideration, which by no commonsense process of reasoning can be so designated", because the Solicitor had mistakenly assumed that the kind of consideration necessary in a lottery case was only what would suffice in an action upon contract.

The Postmaster appealed to the Court of Appeals, Second Circuit, and moved in that court for a stay of Judge Byers' order pending appeal. Judges A. N. Hand, Chase and Clark heard the application. The court held (Judge Clark dissenting) that the Postmaster's motion for a stay should be denied for the reasons stated in Judge Byers' opinion. Judge Clark, in a dissent, viewed the scheme as a lottery. He held in effect that since "the merchants providing the prizes secured the inestimable advertising boon of bringing the potential prize-seeking customers right into their stores, following hard upon diligent examination of the shop window displays to discover the lucky prize numbers" there was sufficient consideration to make the scheme a lottery, and that the treasure hunters' participation furnished the requisite consideration.[6]

If window shopping by the treasure hunters was not such a "consideration" as would make the treasure hunt scheme a lottery, is listening to the radio or watching a television screen the type of consideration that would make a give-away program a lottery? If not, then subdivisions 2 to 4 inclusive of paragraph (b) of the

---

will make their investment profitable, not to forbid them from performing acts having no intrinsic value to anyone. Perhaps the decision can be sustained on the ground that while people did not have to bid at the auction to be eligible to receive the automobile, it was reasonably probable that this would be the case."

6. The Postmaster's appeal from Judge Byers' order was later abandoned, and Judge Byers later ruled that his decision on the plaintiff's original application for an injunction had thus become a final determination of the controversy. D.C., 104 F.Supp. 235.

Commission's rules go beyond the scope of the lottery statute and are an unlawful exercise of the rule-making power.

The danger of "impoverishment" to the participants and the development in them of a "gambling spirit" have been mentioned in some of the earlier cases as the evils of a lottery. The leading case on lotteries, Horner v. United States, 147 U.S. 449, 13 S.Ct. 409, 37 L.Ed. 237, quotes from decisions and state laws against lotteries, and cites the "pernicious tendencies" which the State laws were designed to prevent. See, also, Phalen v. Virginia, 8 How. 163, 49 U.S. 163 at page 168, 12 L.Ed. 1030. I fail to see anything akin to those evils imperiling the invisible radio and television audience who listen and view the type of program condemned by subdivisions (2), (3) and (4) of paragraph (b) of the Commission's Rules. Those programs cannot be classed as a "reprehensible type of gambling activity which it was paramount in the congressional mind to forbid". (See Report of the House of Representatives Committee on Section 1305 of the United States Criminal Code, referred to in footnote No. 2 above.)

In the legal opinions given by the United States Attorney General to the Commission in 1940 the type of program now condemned by the Commission's Rules as a lottery was held not to be covered by Section 316 of the Federal Communications Act (now § 1304 of the Criminal Code). [See Exhibits E, F, G, H, I and J annexed to the American Broadcasting Company's affidavit herein.] The Commission thereupon sought to have the Congress specifically prohibit this type of program and wrote Senator Wheeler on December 30, 1943. [See Exhibit "D" annexed to the American Broadcasting affidavit.][7] The Interstate Commerce Committee of the Senate (of which Senator Wheeler was Chairman) took no action on Chairman Fly's request.

This is not a case where the Court is asked to set its opinion over and above that of the Commission or of a majority of the Commission's membership. There are seven members of the Federal Communications Commission. The rules under attack were adopted by the action of only four of the members. One of the four dissented. The basis of that dissent was that there was nothing of value given by any of the participants for the chance of winning a prize. If we grant an injunction against the enforcement of Rule (b) (2), (3) and (4) we shall not be holding contra to the view of a majority of the Commission; and our decision will be in accord with opinions, concerning similar "give-away" programs, rendered by the Attorney General in 1940, although the Attorney General now appears in support of the Commission's new rules.

These rules do not involve any of the scientific or technical problems of radio or television, or their statistical field and inter-station relationships, concerning which the Commission has expert knowledge. The Commission's opinion, although entitled to respect, is not authoritative. Interstate Commerce Comm. v. Service Trucking Co., 3 Cir., 186 F.2d 400; Lincoln Electric Co. v. Commissioner of Int. Rev., 6 Cir., 190 F.2d 326. We need not consider as applicable the admonition of Judge Frankfurter in National Broadcasting Co. v. United States, 319 U.S. 190 at page 218, 63 S.Ct. 997, 87 L.Ed. 1344, that the courts should hesitate to substitute their own views for those of the Commission in matters peculiarly within the knowledge and experience of the Commission. The basic question presented on these motions is the interpretation of the lottery statute, § 1304, and its application to the

---

**7.** In his letter to Senator Wheeler, Chairman Fly stated: "The problem of money give-away programs is a very troublesome one in broadcasting * * * Under the present section 316 of the Communications Act, the Commission has been unable to deal adequately with the problem * * * I believe the matter is serious and important enough to warrant action by Congress at this time". The Chairman enclosed a proposed draft of a new Section 316 directed at give-away programs. The Chairman also stated in his letter that: "Under this type of program, listeners are attracted not by the quality of the program but simply by

types of programs condemned by the Commission's Rules. That is a legal question and peculiarly within the province of the courts.

### Constitutional Questions.
### The First Amendment—Free Speech.

 Broadcasting and television are entitled to the protection of the First Amendment to the Constitution, guaranteeing freedom of speech and of the press. The amendment has been held to apply to moving pictures, "like newspapers and radio". United States v. Paramount Pictures, 334 U.S. 131, 166, 68 S.Ct. 915, 933, 92 L.Ed. 1260. But that guarantee does not shield either the individual or the press, or any media for the communication of thought, from the application of criminal laws designed for the protection of the general public. Free speech is not absolute but relative. Dennis v. United States, 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137. The Rules of the Commission, *in their subject matter* (lotteries), did not infringe the right of free speech or free press guaranteed by the First Amendment. In re Rapier, 143 U.S. 110, 12 S.Ct. 374, 36 L.Ed. 93; Horner v. United States, 143 U.S. 207, 12 S.Ct. 407, 36 L.Ed. 126; Donaldson v. Read. Magazine, 333 U.S. 178, 68 S.Ct. 591, 92 L.Ed. 628; National Broadcasting Co. v. United States, 319 U.S. 190 at page 227, 63 S.Ct. 997, 87 L.Ed. 1344; Johnston Broadcasting Co. v. Federal Communications Comm., 85 U.S.App.D.C. 40, 175 F.2d 351. But in so far as some of their provisions [paragraph (b) (2), (3) and (4)] go beyond the scope of Section 1304 of the Criminal Code, they may be considered as a form of "censorship" and to that extent they would be in violation of the First Amendment.

 The merits of the "give-away" programs are not an issue in this case.

They appear to be a source of amusement for many thousands of people. Even if it could be said that "we can see nothing of any possible value to society" in these programs, "they are as much entitled to the protection of free speech as the best of literature" or music. Winters v. People of State of New York, 333 U.S. 507, 68 S.Ct. 665, 667, 92 L.Ed. 840. When the radio or television audiences tire of them, they will make their exit. But the Commission cannot hurry them off by characterizing certain features of the "give-away" programs as lotteries, if as a matter of law they are not.

Plaintiffs assert that the rules, if given effect, would deprive them of their property without due process of law, in contravention of the Fifth Amendment to the Constitution,[8] and would subject them to punishment for a crime without a jury trial, in violation of the Sixth Amendment and Article III, Section 2, Clause 3 of the Constitution; and that the Rules constitute a Bill of Attainder in violation of Article I, Section 9, Clause 3.

In formulating the rules in question the Federal Communications Commission was motivated by the belief that the "give-away" programs involving radio and television audience participation fell within the prohibitions of Title 18 U.S.C.A. § 1304. The rules, according to the Commission's report, were intended to give effect to the Congressional intent expressed in Section 1304, to prevent the furtherance of lottery schemes through the use of interstate broadcasting media.

Under the provisions of the Federal Communications Act the broadcasting company would be entitled to a trial and would have a right of review in the courts, including the right to an injunction pendente lite.

the hope of being awarded a valuable prize simply by listening to a particular program. This is not good broadcasting".
8. "Amendment V—Capital Crimes; Due Process
"No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

The provisions of the Federal Communications Act and of the Administrative Procedure Act would have to be followed. That would be a compliance with the due process amendment. Columbia Broadcasting Co. v. United States, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563.

The power of the Federal Communications Commission to grant or withhold licenses in the public interest and to make such rules as will carry out the intendment of the Federal Communications Act implies a grant of authority to employ the means necessary to discharge the powers conferred. Stahlman v. Federal Communications Comm., 1942, 75 U.S.App.D.C. 176, 126 F.2d 124; Federal Communications Comm. v. Pottsville Broadcasting Co., 309 U.S. 134, 60 S.Ct. 437, 84 L. Ed. 656. The means chosen by the Commission to compel compliance with its rules was to deny a license or a renewal license to any applicant whose radio or television activities were found to violate the Commission's Rules. Federal Communications Commission v. W. O. K. O., 329 U.S. 223, 67 S.Ct. 213, 91 L.Ed. 204. A finding by the Federal Communications Commission that its rules had been transgressed would not amount to a conviction for a crime Mansfield Journal Co. v. Federal Communications Comm., 1950, 86 U.S. App.D.C. 102, 180 F.2d 28 nor would the denial of a license to an applicant be a punishment for a crime. The enforcement of the rules would not violate the Sixth Amendment, or Article III, Section 2, Clause 3, or Article I, Section 9, Clause 3 of the Constitution.[9]

The purpose of the Sixth Amendment and of Article III, Section 2, Clause 3, was to assure a defendant, in a criminal prosecution, that he would have a speedy and public trial by an impartial jury in a proper venue with the right of confrontation, the assistance of court process and of counsel. Article I, Section 9, Clause 3, prohibits the passage of any Bill of Attainder, which has been described as a legislative act which inflicts punishment without a judicial trial. United States v. Lovett, 328 U.S. 303, 66 S.Ct. 1073, 90 L.Ed. 1252. Neither of the above amendments nor the specified sections of the Constitution have any application to the facts of these cases.

The parties having stipulated the facts, no findings of fact need be made. The stipulation and defendants' motion concede plaintiffs' allegations of "irreparable injury". Our conclusions of law sufficiently appear in the above opinion and in the relief to be granted in the final judgment.

Relief Granted.

Plaintiffs' motions for summary judgment in their favor are granted to this extent, that the Federal Communications Commission will be permanently restrained and enjoined from enforcing subdivisions (2), (3) and (4) of paragraph (b) of its interpretative rules adopted August 18, 1949, in relation to radio and television give-away programs; and the Commission's order adopting the rules will, to that extent, be vacated and set aside.

As to paragraphs (a) and (b) (1) of the said rules, plaintiffs' motions for summary judgment and an injunction are denied; and the Commission's order, adopting the

---

9. "Amendment VI—Jury Trial for Crimes, And Procedural Rights

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

"Art. III—Section 2, Clause 3. Criminal Trial by Jury.

"The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed."

"Art. I—Section 9, Clause 3. Bill of Attainder and Ex Post Facto Laws

"No Bill of Attainder or ex post facto Law shall be passed."

rules, is upheld in respect to said paragraphs (a) and (b) (1) of the rules.

Defendants' motions to dismiss the amended complaints are denied. Defendants' motions for summary judgment in defendants' favor are granted only in respect to paragraphs (a) and (b) (1) of said rules. Defendants' motion to strike paragraphs 13, 14 and 16 of the National Broadcasting Company's amended complaint is granted.

Let a final judgment be settled accordingly, on ten days' notice.

WEINFELD, District Judge, concurs.

CLARK, Circuit Judge (dissenting).

Judge LEIBELL'S masterly analysis of the case shows that the only point of doubt or concern is as to whether "consideration" is given in return for a chance at substantial and valuable prizes or financial awards. Though earnestly argued by the several plaintiffs, the other contentions—some rising to the constitutional level—are unconvincing and I agree with the court in overruling them. But on the one issue which thus proves controlling, I do not feel that my brothers have reached a result which is consistent with law, or, indeed, with reason, and I accordingly dissent.

Before I turn to this, I shall briefly dispose of some underbrush. It seems to me that not only was the Federal Communications Commission justified in tackling this thorny subject, but, indeed, it was its duty to do so and it is to be commended for its efforts at length to have the matter definitely determined. Like the enforcement of all sumptuary or moralistic legislation, there is a natural desire to pass the buck to others; and this may be accentuated where a showing of criminality would be required for the pressing of an indictment. But when the Congress says that "Whoever broadcasts by means of any radio station for which a license is required by any law of the United States" shall not do certain things under pain of fine and imprisonment, 18 U.S.C. § 1304, the licensing authority must surely take some heed of the mandate and act accordingly if it is not to wink at or impliedly approve the law's violations. So it does seem to me that past actions or refusals to act of other governmental agencies or officers have little bearing on our problem. Suffice it to say that now the Commission and the Department of Justice are loyally and co-operatively engaged in advancing what they—and I—think to be a correct interpretation of law. Against this there obviously can be no estoppel to operate against either the United States of America or any one of its agencies.

Now I turn to the specific issue. It is well to recall the statute, now a part of the Criminal Code, 18 U.S.C. § 1304, formerly a part of the Federal Communications Act, 47 U.S.C. § 316, adopted in June, 1934. Its prohibition is against "the broadcasting of, any advertisement of or information concerning any lottery, gift enterprise, or similar scheme, offering prizes dependent in whole or in part upon lot or chance, or any list of the prizes drawn or awarded by means of any such lottery, gift enterprise, or scheme." I emphasize two matters: (1) Within the prohibition are not merely lotteries, but gift enterprises and any "similar scheme" offering prizes dependent upon "chance"; (2) the statute does not mention "consideration." I stress the first because there does seem to be a feeling in the case that it concerns "buying" a ticket to the drawing of some grand prize in the good old-fashioned sweepstakes manner. But the statute is much broader, as broad in fact as it could possibly be made for the objectives in view. It is more inclusive, for example, than such a statute as N.Y. Penal Law, McK.Unconsol.Laws, c. 40, § 1370 reaching "the distribution of property by chance, among persons who have paid or agreed to pay a valuable consideration for the chance." So it is not without significance that when Congress in 1950 wished to validate "any fishing contest not conducted for profit wherein prizes are awarded for the specie, size, weight, or quality of fish caught by contestants in any bona fide fishing or recreational event," it felt it had to do this by specific exemption. 18 U.S.C. § 1305. And the omission of any reference to consideration—unlike the New York statute, for example—carries its own meaning. The federal law contains no technical requirement of consideration as such; whatever is read into the statute

must be what will carry out its essential purpose.

Now the essential purpose cannot be over-simplified to debauchery by a single grand lottery, or even several lotteries, as the initial and leading case of Horner v. United States, 147 U.S. 449, 13 S.Ct. 409, 37 L.Ed. 237, is at pains to point out. Rather it is aimed at a somewhat less direct road to waste and want: the lack of industry and initiative induced by initial success in getting valuable returns from the operation of chance. There is also quite specifically the unjust enrichment which accrues to the manipulators of the scheme. But it is still possible for anyone—advertiser, broadcaster, or what not—to make pure gifts; the Commission calls attention to the plot of a moving picture of twenty years ago, "If I Had a Million," and says that if "a rich man gives away his millions to persons chosen at random, it may be conceded that no evil would be done and no violation of the law would be involved." So what we are looking for is really some gain to the promoters of the scheme which takes the matter out of the realm of pure altruism.

This, of course, greatly simplifies the problem. But I believe it makes sense of it, too. To inquire whether the broadcasters and their advertising customers are engaged in altruistic operations is of course to supply the answer at once. What they are doing is to purchase time to advertise and vend their wares—indeed the most valuable time conceivable, as is alleged in the papers before us and conceded by all.[1] The time spent by a single listener may be quite brief. But the time spent by the whole country in hanging for an hour more or less breathlessly upon a nationwide broadcast which may (but probably will not) yield the listeners returns ranging from refrig-erators, pianos, and trips to South America to good hard cash beyond their wildest dreams provides so stupendous an audience for the advertising message as hardly to be estimated. And I suspect that the time spent by any single listener is almost always considerable. A few fleeting moments will not be adequate to learn what the rules are, hear and guess the tune or the answer to the question, and accept and answer the fateful telephonic inquiry. One is just impelled to hear the hour out, and, having gotten the hang of it, to come back the following week, and have the family listen as a part of the game until the announcer calls.

My brothers, it seems to me, are drawn away from the natural answer by the odd mistake that what is involved as the "price" or "valuable consideration" (terms themselves constituting an overprecise formulation of the issue, as I have pointed out) is not value "to the station or sponsor," but "It is the value to the participant of what he gives that must be weighed." Of course, the participant must yield something; if he is quite supine, there would be a gift. But surely the application made by my brothers quite inverts the requirement and makes it meaningless and irrational. It is what the operator receives—in terms of value to himself—which must necessarily mark the difference between a gift and a chance, between altruism and business. The opinion appears to hold that while receiving the benefit of something as valuable as this radio time does not cast doubt upon the sponsor's altruism, yet the participant's expenditure of any pecuniary amount—even "a cent," see note 5 of the opinion—makes the scheme at once illegal.[2] And the amount given need not even go to the operator. Such a view not only makes evasion easy and enforcement in natural

---

1. Indeed, audiences are already becoming hardened to what were once considered fabulously high give-away bonanzas. See the following item in the N.Y. Times, Dec. 28, 1952, Sunday Radio Section, p. X 11: "Hard Times. A doorman from A. B. C.'s Ritz Theatre stood at the corner of Broadway and Forty-eighth Street one morning last week with a handful of tickets. 'Get your free tickets to "Break the Bank,"' he yelled, 'the biggest money-paying show on the air. Offering $2,900.' In ten minutes he unloaded just two tickets."

2. The statement "a cent is enough" quoted in the opinion from 45 Harv.L.Rev. 1196, 1206, appears to be borne out by the cases cited: People v. Runge, 3 N.Y.Cr.R. 85, 34 Hun 634; Glover v. Malloska, 238 Mich. 216, 213 N.W. 107, 52 A.L.R. 77, holding also that not all the participants need pay even the one cent

course difficult, if not impossible; it also— and I say this with deference—makes the whole approach irrational. To say that here we have pure donation, whereas we would have a lottery if the participant were required to deposit a penny in a collection plate, or even a dime in a March-of-Dimes kettle, just does not make sense. The applicable test is not any strict doctrine of yielding a symbolic peppercorn to formalize a contract or a conveyance. It is a practical one, perceptive of the fact that the yield to the operator is surely all important. And this is recognized in the well reasoned cases, such as State v. Wilson, 109 Vt. 349, 196 A. 757, cited below.

If the issue can thus be made comparatively simple, why has so considerable an amount of concern, if not confusion, developed in the cases? A part of this is undoubtedly occasioned by differences in the governing law; thus cases under the New York statute cited above would hardly be safe authorities under the federal law. But the main reason, I believe, lies elsewhere and, in fact, is not hard to discern. It seems to be found in all cases of attempts to enforce moral precepts which to a large part of the community seem strange and excessively puritanical. The analogy of the Prohibition Amendment is close. Since the law seems harsh, a search most diligent is made to cut down its more drastic operation; in fact, the mind seems to revolt at enforcement of its harsher elements. That, I think, is the real meaning. If people want to waste their time in listening to radio programs in the hope or off-chance of winning some valuable prizes, why not let them do it. That is a widespread attitude, with which, of course, I have considerable sympathy. But I think we should draw the line when it goes so far as to make a joke of an existing law, to turn an understandable, if unliked, prohibition into one which is unintelligible. After all, the fate of the Prohibition Amendment shows the proper eventual remedy.

My brothers do not collect cases, nor shall I. It is a barren task in this problem.

For courts and writers have found or created confusion and doubt, and it does little good to catalogue this. Moreover, as stated, many precedents concern differing legal situations. I shall content myself with a few authorities I consider most apposite. First I cite Maughs v. Porter, 157 Va. 415, 161 S.E. 242, the case of a lottery found in attendance at a real estate auction sale where an automobile was to be given away to a person present, not only because it is a leading case, but also because of the friends and enemies it has made. Thus it has been approved in the persuasive case, cited earlier, of State v. Wilson, 109 Vt. 349, 196 A. 757, holding a theater "bank night" scheme a lottery. Attempts to answer the court's analysis have produced fresh difficulties, forcing one commentator to the extreme, found indeed in several of the opposing cases, of requiring a monetary or a pecuniary consideration, 18 Va.L.Rev. 465, while another, trying to avoid going so far, says that the consideration while present was not "of economic value"—a masterpiece of unreality, particularly as applied here. 80 U. of Pa.L.Rev. 744. Another writer quoted for the "a cent" proposition of note 5 of the opinion concludes some tendentiously critical remarks with this bromidic statement: "Perhaps the decision can be sustained on the ground that while people did not have to bid at the auction to be eligible to receive the automobile, it was reasonably probable that this would be the case."(!) Pickett, Contests and the Lottery Laws, 45 Harv.L.Rev. 1196, 1206 n. 37. The requirement of a pecuniary consideration may perhaps be justified under some statutes. Surely, however, that is nowhere a requisite of the federal Act. Further explanation of the requirement of consideration to distinguish away a gift is found in such cases as Affiliated Enterprises v. Waller, 1 Terry 28, 40 Del. 28, 5 A.2d 257; Furst v. A. & G. Amusement Co., 128 N.J.L. 311, 25 A.2d 892; Glover v. Malloska, 238 Mich. 216, 213 N.W. 107, 52 A. L.R. 77; State v. Jones, 44 N.M. 623, 107 P.2d 324; Affiliated Enterprises v. Gantz,

which is currently the consideration; and Stewart v. State, 108 Tex.Cr.R. 661, 2 S.W.2d 440, holding also that the coin need not be current money of rec-

ognized value. So, too, services, such as selling a book, are sufficient. Loveland v. Bode, 214 Ill.App. 399.

394

10 Cir., 86 F.2d 597; Central States Theatre Corp. v. Patz, D.C.S.D.Iowa, 11 F. Supp. 566; State of Kansas ex rel. Beck v. Fox Kansas Theatre Co., 144 Kan. 687, 62 P.2d 929, 109 A.L.R. 698, with annotation at 709; State of Missouri ex rel. McKittrick v. Globe-Democrat Pub. Co., 341 Mo. 862, 110 S.W.2d 705, 113 A.L.R. 1104, with annotation at 1121. And not without some immediate point are the many decisions upholding F. T. C. orders against the use of lottery devices, such as punch boards, in the distribution of candy. Consolidated Mfg. Co. v. F. T. C., 4 Cir., 199 F.2d 417, citing cases; Sweets Co. of America v. F. T. C., 2 Cir., 109 F.2d 296.

The reasoning and the cases cited seem to me rather compelling to sustain the Commission's ruling. Were I more in doubt, I should feel some compunction to uphold the defendants' position out of some deference to the respect due the decisions made by the agencies of government having the prime responsibility. But I do not think resort to that principle necessary. Nor do I find what I should regard as apt authority to the contrary. Perhaps I should make reference to Garden City Chamber of Commerce v. Wagner, D.C.E.D.N.Y., 100 F.Supp. 769, 772, for that involved a similar statute, 18 U.S.C. § 1302, covering the use of the mails for lottery. In that case the court said that "the consideration requisite to a lottery is a contribution in kind to the fund or property to be distributed." This principle I think cannot be upheld and I understand the plaintiffs herein do not support it. And so further reflection has strengthened my belief in the validity of the position I took in dissent when the case came before us on application for a stay pending appeal, 2 Cir., 192 F.2d 240. Our consideration was not on the merits, but as the result of a brief hearing on our motion calendar. A motion for a stay of this ingenious scheme of local and neighborhood merchants for Christmas sales was obviously not very appealing; further, it required summary disposition in view of the pressure of time—it was submitted November 13 and decision was filed November 16, 1951; and denial of the stay, carrying the matter beyond the Christmas season, made the question moot for all prac-

tical purposes. The case cannot therefore be regarded as a definitive precedent disposing of the issue.

I think it therefore appropriate to reiterate by way of summary that my colleagues suggest no workable dividing line between what is "value" and what is not in deciding what the participants in these giveaway schemes have themselves given. On the contrary, they seem to me to have rejected the understandable tests to which persuasive precedents point. I fear, therefore, that our decision will serve to promote more confusion than it allays. For my part I would dismiss the plaintiffs' complaints on the merits.