THE STATE, Appellant, v. R. W. McEwan.—120 S. W. (2d) 1098.

Court en Banc, November 16, 1938.

Roy McKittrick, Attorney General, and Franklin E. Reagan, Assitant Attorney General, for appellant; F. E. Williams of counsel.

214

*S. P. Halpern* and *Fred Bellemere* for respondent.

WESTHUES, C.—The State's brief contains a fair statement of the case, which we adopt. It reads:

"This is a prosecution under Section 4314, Revised Statutes of

Missouri 1929, for making and establishing a lottery known as 'Bank Night.' The Circuit Court sustained a demurrer to the sufficiency of the information, and the State prosecutes this appeal.

"The first paragraph of the information follows the language of the statutes and among other things alleges:

'. . . that R. S. McEwan . . . on the 18th day of June, 1935, at the County of Jackson, State of Missouri, did knowingly, willfully, feloniously and unlawfully make and establish as a business and avocation, a certain lottery and scheme of drawing in the nature of a lottery known as 'Bank Night,' whereby a large sum of money, to-wit, $125.00, was thereafter to be disposed of by lot and chance on said date. . . .'

"The remainder of the long information with special particularity and in detail describes the scheme of 'Bank Night' as set up and operated by the defendant at the Ashland Theatre in Kansas City, Missouri, for drawings on five successive weeks or 'bank nights' beginning with the night of May 21, 1935 and ending with the night of June 18, 1935, namely May 21, May 28, June 4, June 11 and June 18, 1935. The information is based upon the lottery set up June 18, for a drawing on 'bank night.'

"In substance the information alleges that the defendant in setting up and establishing 'Bank Night' furnished at the Ashland Theatre a registration book, a drawing box, and a quantity of numbered coupons or tickets, and certain advertising media for the screen and the front of the theatre. The registration book contained serial numbered lines and was installed in the outer lobby of the theatre for the registration of names and addresses of persons over the age of eighteen years who might be interested in a drawing. The coupons bore serial numbers corresponding to the serial numbers in the registration book. As names were registered opposite the numbers in the registration book, coupons or tickets bearing identical numbers were deposited in the drawing box. All persons over the age of eighteen years, including patrons, non-patrons and members of the public generally were invited to do two things:

"(1) To call at the theatre and register their names and addresses in the registration book at will and without charge.

"(2) To be present at the theatre, either inside or outside, at nine o'clock sharp on each Saturday night.

"In this connection the theatre offered said persons over the age of eighteen years who would comply with said conditions of registration and attendance, the following:

"(1) It would provide a prize of Twenty-five dollars for each Saturday night.

"(2) It would draw one coupon or ticket from the box on the stage each Saturday night at nine o'clock and immediately announce

the number and the name thereon from the stage and at the front door of the theatre.

"(3) It would award the prize at such time, if, as and when the holder of the number drawn made claim for same within two and one-half minutes after said announcement.

"(4) In the event the holder of the winning number thus announced was on the outside of the theatre, and heard the announcement, identified himself and made claim for the prize within two and one-half minutes, he would be permitted to enter the theatre and obtain the prize without paying any admission fee.

"(5) That if the prize for any Saturday night were not awarded it would be added to the $25.00 prize money for the following week; and if this total of $50.00 were not thus awarded it would be in like manner added to the $25.00 prize money for the drawing the following week; and so on indefinitely.

"The earliest prize mentioned in the information was the one for $25.00 offered May 21, 1935, and the prize of $125.00 upon which the information was based, was offered June 18, 1935. There was, therefore, no award of any prize at any time so that the prize money of $25.00 a week accumulated to constitute the offered (though unawarded) prizes for the five weeks as follows:

May 21, 1935 ..................................... $ 25.00
May 28, 1935 ..................................... 50.00
June 4, 1935 ..................................... 75.00
June 11, 1935 ..................................... 100.00
June 18, 1935 ..................................... 125.00

"The registration was permanent and the drawing box at all times contained coupons for all registrants. If the holder of the number drawn were not present or did not make claim within two and one-half minutes after the announcement of the winning number there was no award—no distribution of prizes.

"The lone issue in this case is the sufficiency of the information. This turns upon the question of whether 'Bank Night' contains all the essential elements of lottery, namely, prize, chance and consideration. The State contends that the information sufficiently charges the awarding of a cash money prize, for a consideration, by chance."

Respondents conceded that the elements of prize and chance were present in the scheme commonly called "bank night" as described in the information. Respondent contends, however, that the third element, that is, consideration, was lacking.

The people established the fundamental policy of this State as to lotteries in the Constitution. Section 10, Article 14, reads:

"The General Assembly shall have no power to authorize lotteries or gift enterprises for any purpose, and shall pass laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery, in this State; and all acts or parts of acts

heretofore passed by the Legislature of this State, authorizing a lottery or lotteries, and all acts amendatory thereof, or supplemental thereto, are hereby avoided."

The State Legislature, in obedience to the mandate of the people, enacted Section 4314, Revised Statutes 1929 (Mo. Stat. Ann., p. 3002), which reads:

"If any person shall make or establish, or aid or assist in making or establishing, any lottery, gift enterprise, policy or scheme of drawing in the nature of a lottery as a business or avocation in this State, or shall advertise or make public, or cause to be advertised or made public, by means of any newspaper, pamphlet, circular, or other written or printed notice thereof, printed or circulated in this state, any such lottery, gift enterprise, policy or scheme or drawing in the nature of a lottery, whether the same is being or is to be conducted, held or drawn within or without this state, he shall be deemed guilty of a felony, and, upon conviction, shall be punished by imprisonment in the penitentiary for not less than two nor more than five years, or by imprisonment in the county jail or workhouse for not less than six nor more than twelve months. [R. S. 1919, sec. 3562.]"

The people of this State have, by the provisions of the Constitution and the act of the Legislature above quoted, in no uncertain term, outlawed all lotteries and schemes in the nature of lotteries. If, therefore, the scheme known as "bank night," described in the information, is in reality a lottery, and within the term of the statute, the courts should not hesitate to declare it a lottery. For an interesting discussion on lotteries see the recent case of State ex rel. v. Globe Democrat Pub. Co., 341 Mo. 862, 110 S. W. (2d) 705 (court en banc). At page 717 of the opinion we note the court said:

". . . it is safe to say that for the public good such schemes should be scanned by the courts with a scrutinous eye."

Schemes to deceive are not new for in Genesis we note that when Isaac became old and blind and realized that his days on this earth were short, he decided to bestow special blessings upon his favorite son, Esau. His wife, Rebekah, disguised Jacob, her favorite son, with gloves made of kid goat skin and Esau's garments and sent him to Isaac to receive the blessings intended for Esau. When Jacob announced his presence to receive the blessings, Isaac became suspicious and said: "Come hither, I pray thee, that I may feel thee, my son, whether thou be my favorite son Esau, or not." When Isaac felt Jacob's hands he said: "The voice is Jacob's voice, but the hands are the hands of Esau." Isaac was deceived and blessed Jacob, thinking he was Esau.

Isaac was blind, and there is an old adage that justice is blind. But justice is only blind insofar as it does not make any distinction between litigants, be they of high or low degree, rich or poor, Jew or Gentile. Justice cannot distinguish one from the other. How-

ever, in detecting fraud and deception justice should have the vision to discover them in their true nature no matter how well the design to deceive. The courts would be blind indeed if they could not see that the scheme described in the indictment is a deliberate plan to evade the lottery statute and at the same time attain the result which the statute has prohibited. The history of these cases conclusively shows that the entire scheme is a deliberate plan to evade the lottery statute. Courts have uniformly held that the scheme of "bank night" is a lottery when the participants therein are limited to those purchasing tickets to the theater. Respondent concedes that to be the law. The plan, as described in the information, attempts to eliminate one of the elements of lottery, that of consideration. In the practical operation of the scheme the element has not been eliminated because it is not in fact free. The Supreme Court of Texas, in the case of City of Wink v. Griffith Amusement Co. (Tex.), 100 S. W. (2d) 695, 1. c. 699 (9-11), correctly analyzed the situation. The court there pointed out that those remaining on the outside did not share equally with those who paid an admission. Those who paid admission witnessed the drawing and heard first hand the announcement of the winning number. Those upon the outside did not. The court concluded:

"This admission charge is inseparable from the privileges enumerated, which were materially different from the privileges of those who remained outside of the theater holding the so-called 'free' registration numbers. It is idle to say that the payment made for seeing the picture is not, in part at least, a charge for the drawing and the chance given. The things to be seen and done in the theater and the privileges above enumerated which accompanied them, are all a part of *one and the same show,* meaning the entire proceedings inside the theater. The fact that part of the things to be enjoyed by those who paid at the door were classed as 'free' by the defendant in error does not change the legal effect of the transaction, or what was actually done by defendant in error, namely, for the price of admission to grant the patron not only the opportunity to see and hear the picture, but to see and hear and enjoy the habiliments of the 'Bank Night,' drawing, etc., detailed above. We are unable to see in what manner the giving of free registration numbers to those outside of the theater would change the legal effect of what was done inside the theater, for which a charge was made . . ."

Upon this point see also the case of Iris Amusement Corp v. Kelly (Ill.), 8 N. E. (2d) 648, 1. c. 653 (3). In the plan described in the information any person desiring to participate therein must be in attendance at the theater, either inside or outside. One cannot sit by his fireside and take part therein. He must be present and swell the crowd at the theater. Such persons naturally get enthused and the gambling spirit, ever present in the human breast, is quickened.

The very evil at which the law is aimed. The stake rises from week to week—$25, then $50, $100, perhaps to $150 or more. Soon the theater is filled with persons on bank night, each hoping that he may be the lucky person. The picture becomes of little importance. The participants in the lottery care little whether the picture is one portraying a masterpiece of Shakespeare or a light modern novel. The so-called free number feature of the scheme is only the goat's skin upon the hands of Jacob. It is there in an attempt to fool the law. The Supreme Court of Illinois in the Iris Amusement Corporation case, supra, said:

"In this scheme there is present every element of the evils attendant upon mass gambling. A small stake concealed within the price of admission gives its chance for a large prize, which may become large enough to arouse intense cupidity; there is the excitement of drawing a lucky number with its attendant exultation for one fortunate individual; there is depression disappointment for a thousand losers, many of whom must think enviously of what they could do with so much money had they won it, and there is the constant temptation to continue to play in the hope of winning. We have thus created cupidity, envy, jealousy and temptation—the very things sought to be avoided by that enlightened public policy of most of the world which has outlawed lotteries."

So the scheme described in the information has, in actual practice, all the elements of a lottery, and is just as harmful as if it were limited to those purchasing tickets. See Commonwealth v. Wall (Mass.), 3 N. E. (2d) 28, l. c. 30, where the court said:

"On the other hand, a game does not cease to be a lottery because some, or even many, of the players are admitted to play free, so long as others continue to pay for their chances. [Glover v. Malloska, 238 Mich. 216, 219, 213 N. W. 107, 52 A. L. R. 77; State v. Eames (N. H.), 183 Atl. 590, 592.] So here the test is not whether it was possible to win without paying for admission to the theatre. The test is whether that group who did pay for admission were paying in part for the chance of a prize. The jury could disregard all evidence introduced by the defendant favorable to him. They could take a realistic view of the situation. They were not obliged to believe that all the ingenious devices designed to legalize this particular game of chance were fully effective in practical operation. . . .

"A participant outside the theatre must wait in discomfort in the hope that if his name should be drawn within he would be notified and would hear the call soon enough to crowd through toward the front of the theatre within such time as might be allowed. The object of the defendant was to fill the theatre, not the lobby or the sidewalk."

We like the expressions of the United States Circuit Court of Appeals, Tenth Circuit, in the case of Affiliated Enterprises v. Gantz, 86 Fed. (2d) 597, l. c. 599, involving an injunction proceeding to

restrain an infringement of a copyright on "bank night." The scheme of "bank night" there was the same as described in the information under consideration. The court said:

"The plan or system portrayed in the copyrighted sheets discloses more than once that an admission charge must not be exacted as a condition entitling one to participate in the drawing. Everyone, if he holds or does not hold or buys or does not buy a paid admission ticket to the show, is entitled to register at the entrance or in the lobby of the theatre, and he is thereupon designated by number opposite his name and must be permitted to have an equal chance with every other registrant in drawing the prize. This seems to be a subterfuge to escape the stigma of being a lottery. It is apparent that no one would give prizes if all participants in the drawings paid no admission fees. Show places are conducted for profit. The plan would be wholly worthless as a money making scheme, both to lessor and lessee. It is further apparent that when non-paying participants and those who pay admissions are each given the same chance at drawing the prize the lucky number may represent one who paid to get in only because of his interest in the drawing. Indeed, that is more than probable. Then how can it be maintained that the supposed evasion converted a lottery or gambling device into a mere altruistic opportunity and occasion to bestow a gift. If not within the literal definitions of those vices, plaintiff's plan and system is too closely akin to have the protection and assistance of a court of equity."

If the plaintiff in that case was denied relief because it did not come into court with clean hands, we ask, why were they unclean? Isn't it apparent that it was because the conscience of the court of equity knew that the scheme was in fact a violation of the law? If it was legal how did the plaintiff's hands become tainted? All of the cases where injunctive relief was denied, are in that class. They certainly lend support to the State in condemning the schemes as lotteries.

We agree with the reasoning in the above cases that a sufficient consideration exists in the scheme to come within the terms of our statute, which makes it a felony to establish or aid in establishing any lottery, gift enterprise, policy or scheme of drawing in the nature of a lottery. We are supported in this conclusion by the following authorities: City of Wink v. Griffith Amusement Co., supra; State v. Danz (Wash.), 250 Pac. 37, 48 A. L. R. 1109; Featherstone v. Independent Service Station Assn. (Tex.), 10 S. W. (2d) 124; Affiliated Enterprises, Inc. v. Gantz, supra; Maughs v. Porter, 157 Va. 415; Iris Amusement Corp. v. Kelly, supra; State ex rel. v. The Fox Theatre Co., 62 Pac. (2d) 929, 144 Kan. 687; Commonwealth v. Wall (Mass.), supra; Jorman v. State (Ga.), 188 S. E. 925, 1. c. 927. In the last case cited the Court of Appeals of Georgia had this to say:

"It cannot alter the fact that the operator may have given free

chances to some without the purchase of tickets; even so, *the lottery scheme as to a gift enterprise was present to all the rest,* and this fact did not prevent it from being a lottery under the law of Georgia." (Italice ours.)

The court also quoted with approval the following from Equitable Loan & Security Co. et al. v. Waring, 117 Ga. 599, 44 S. E. 320, l. c. 327, 62 L. R. A. 93, l. c. 100:

"As fast as statutes are passed or decisions made, some skillful change is devised in the plan of operations, in the hope of getting just beyond the statutory prohibition; but, so long as the inherent evil remains, it matters not how the special facts may be shifted, the scheme is still unlawful."

In 38 Corpus Juris 292, section 7, it is said:

"Whatever may be the nature of the consideration required it may be given either directly or indirectly. The benefit to the person offering the prize does not need to be directly dependent upon the furnishing of a consideration."

Can it be denied that the requirement in the scheme, that all persons participating in "bank night" must be in attendance, is not a revenue producer for the theater?

A number of the cases which have held the scheme legal are: Affiliated Enterprises v. Gruber, 86 Fed. (2d) 958; State v. Hundling (Iowa), 264 N. W. 608; Yellow-Stone Kit v. State, 88 Ala. 196, 7 So. 338; State v. Crescent Amusement Co. (Tenn.), 95 S. W. (2d) 310; State v. Eames (N. H.), 183 Atl. 590. We cannot follow the reasoning as outlined in those authorities because we feel that in doing so we would be joining hands with those who designedly devise ways and means to evade our lottery laws and thereby defeat the very purpose of our Constitution and the law enacted in obedience thereto. Such a policy can only tend to force the legislators to constantly enact new laws to meet the ever increasing cunning devices to evade the existing laws.

The judgment of the trial court is reversed and the cause remanded for trial. The above opinion is a modification of the original opinion. The modification was made after the filing of a motion for rehearing, which motion is hereby overruled.

PER CURIAM:—The foregoing opinion by WESTHUES, C., in Division Two, is adopted as the opinion of the Court en Banc. All the judges concur.