STATE of Missouri, at the relation of GLENDINNING COMPANIES OF CONNECTICUT, INC., Dansico Associates, a Division of Mallory Randall Corporation, the Great Atlantic & Pacific Tea Company, Inc., Fleming Foods Company and Wetterau, Incorporated, Plaintiffs-Respondents,

v.

Albert LETZ, Supervisor of Liquor Control, State of Missouri, Defendant-Appellant,

Gerbes Super Markets, Inc., Intervenor-Respondent.

No. KCD 30334.

Missouri Court of Appeals, Western District.

Oct. 29, 1979.

Motion for Rehearing and/or Transfer to Supreme Court Denied Dec. 3, 1979.

Application to Transfer Denied Jan. 15, 1980.

Lori J. Levine, Jefferson City, for defendant-appellant.

Robert B. Olsen and Irwin E. Blond, Kansas City, for plaintiffs-respondents.

Thomas A. Vetter, Jefferson City, for intervenor-respondent.

Before DIXON, P. J., and TURNAGE and KENNEDY, JJ.

KENNEDY, Judge.

This is an appeal by the defendant Supervisor of Liquor Control from a declaratory judgment of the Circuit Court of Cole County, by which the court declared that certain gambling-type promotional games manufactured and sold by plaintiffs Glendinning Companies of Connecticut and Dansico Associates, and sponsored by the plaintiffs Great Atlantic & Pacific Tea Company, Fleming Foods Company, Wetterau, Incorporated, and intervenor Gerbes Super Markets in the promotion of their respective grocery businesses, did not violate Regulation 15(k) (11 CSR 70–2.140(12)) promulgated by defendant Supervisor.

Participating in the games were 22 Missouri stores of plaintiff A & P; 46 owned by or affiliated with plaintiff Fleming Foods; 151 owned by or affiliated with plaintiff Wetterau; and 9 owned by intervenor Gerbes. Most of these stores had licenses to sell liquor or non-intoxicating beer, issued under §§ 311.200 and 312.030, respectively, RSMo 1978.

Defendant Supervisor had threatened to institute proceedings for the revocation or suspension of the retail liquor and non-intoxicating beer licenses of plaintiffs' and intervenor's stores if they continued to sponsor the games. The Glendinning Companies, Dansico, A & P, Fleming and Wetterau filed this declaratory judgment action against the Supervisor, seeking the court's ruling that the games were not in violation of the Supervisor's regulation. Gerbes later entered the case as an intervenor. Gerbes' posture is that of a plaintiff, and will hereinafter be included in the designation "plaintiffs".

*The regulation.*

Regulation 15(k) (11 CSR 70–2.140(12)) reads as follows:

"No licensee shall allow upon or about his licensed premises, any gambling of any kind or character whatsoever in which the one who plays stands to win or lose money, trade checks, prizes, merchandise or property or any other consideration whatsoever. No licensee shall have any gambling devices upon his licensed premises whereby money, trade checks, prizes, merchandise or property or any other consideration whatsoever may be won or lost."

The rule has been in effect since February 18, 1973.

*The games.*

The games were quite similar to each other, and we need describe only one of them in detail, as representative of all. The independent "United Super" stores, associated with plaintiff wholesaler Fleming Foods, and also the Green Hills stores, owned by Fleming, sponsored a game called "Gamerama", manufactured by plaintiff Dansico, and which was played as follows:

The player, who is assumed to be the customer, receives, usually at the sponsoring store, a master card which contains six different games. The games are designated "Bingo", which carries a $5 prize; "Cards", which carries a $1,000 prize; "Square", which carries a $100 prize; "Luck", which carries a $1 prize; "Two Pair", which carries a $2 prize; and "Fill Your Flush", which carries a $20 prize.

Each one is actually a bingo-type card, containing a square subdivided into smaller squares. "Bingo", "Square" and "Luck" each contains numbers on the small squares, along with random squares marked "Free".

The squares on the "Cards", "Two Pair" and "Fill Your Flush" contain playing card designations—five spade, queen diamond, and so forth—and also include "Free" squares.

The player receives, by a process hereafter described, Gamerama "markers". The markers are the same size as the squares and contain numbers or playing card designations. If a player gets a marker corresponding to any of the numbers or playing card symbols on his game card, he inserts that marker in the corresponding square on the game card. When the markers, along

with the "Free" squares, form a straight row across, down or diagonally on any of the cards, with the exception of "Two Pair" and "Fill Your Flush", he is the winner of the indicated cash prize. In the case of "Two Pair" and "Fill Your Flush", the prizewinning combination is to fill a row across, in order to complete the poker hands indicated by the names. For example, one of the winning combinations on the $20 "Fill Your Flush" card in evidence is: King of Hearts, Eight of Hearts, Ace of Hearts, Free, and Two of Hearts, in a horizontal row. The "Free" space is counted in the row, although there is no marker for that space.

Having filled up a row so as to qualify for a prize, the lucky player takes the game card to the sponsoring store and, in the presence of authorized store personnel, he initials the backs of the markers and the completed row. The store gives him his $1, $2 or $5 prize on the spot. If, however, he has won $20, $100 or $1,000, the store will send the initialed markers and the game card, together with a "Prize Submission Agreement" for verification. Upon verification, the winner will be awarded his prize. There is no "Prize Submission Agreement" in evidence and no testimony as to what is involved in "verification". The instructions say that a Federal Trade Commission rule requires that the names and addresses of winners be posted in all participating stores.

The winning player, instead of taking the game card, markers and signed "Prize Submission Agreement" form to the store, may instead mail it to an address given on the card.

The Gamerama master card can be secured upon request at a sponsoring store at the end of the checkout or at the store office. A player may get one free game ticket—which includes four of the "markers", used to fill up corresponding squares on the game card—each time he visits a participating store. The game card and newspaper advertising in evidence include "odds charts" which show a player's chances of winning the various prizes depending upon the number of his "store visits". The chances of winning a $100 prize during the period June 16–July 15, 1977, for instance, increase from 23,140-to-1 for one store visit to 890-to-1 for 26 store visits. The odds change and are updated and posted in the stores and in newspaper advertisements each month. A person can request game materials, including master cards and game tickets, by mailing request to Gamerama Mo., P.O. Box 26, Hazelwood, Missouri 23042. Only one request may be included in an envelope. When the game materials are returned to the person requesting them, there is also sent a first-class stamp for reimbursement. Game materials may also be requested by calling a toll-free number, shown on the game card and in the newspaper advertising. Only one telephone or mail request may be made per day for game materials to be mailed to one person or to one address. In response to mail and telephone requests, plaintiffs Wetterau, Fleming and A & P distributed 21,490 "game pieces", as the game cards and game tickets are called, out of a total distribution of 23,075,000.

Upon the distribution of all game tickets (which, as before noted, contain the markers), the game ends. By some means not disclosed on the game card, an announcement of termination is made. All prizes must be claimed within five days after announcement of termination or they are forfeited. Moreover, whenever the advertised number of prizes have been verified, that game shall "immediately and automatically terminate without notice", and any unverified claims in process or received after that time are automatically rejected.

*Mootness.*

█ A preliminary matter must first be considered. Respondent moves for a dismissal of the appeal of the Supervisor of Liquor Control on the ground that the case has become moot as a result of the enactment of § 572.100, RSMo 1978, a part of the Criminal Code. A case is moot if the decision of the court can have no practical and enforceable consequences as between the parties. The court does

not indulge in academic exercises, but operates upon live controversies. *Magenheim v. Board of Education,* 347 S.W.2d 409, 417 (Mo.App.1961).

The section which according to the plaintiffs moots the present case, reads as follows: "The general assembly by enacting this chapter intends to preempt any other regulation of the area covered by this chapter. No governmental subdivision or agency may enact or enforce a law that regulates or makes any conduct in the area covered by this chapter an offense, or the subject of a criminal or civil penalty or sanction of any kind." § 572.100, *supra.*

Chapter 572 deals with the subject of gambling as a crime. Plaintiffs say that section, as of its effective date, January 1, 1979, nullified the supervisor's regulation, and, even as to violations of the regulation which occurred before January 1, 1979, removed from the supervisor any power of enforcement after that date.

The parties assume that the above-quoted statute does indeed have the effect contended for by plaintiffs with respect to violations occurring *after* January 1, 1979, but the supervisor argues that violations occurring before January 1, 1979, subject the licensee to suspension or revocation of his license after that date.

▇▇▇ We conclude, however, that § 572.-100 does not nullify the supervisor's regulation [1] either as to violations occurring before or after January 1, 1979, and our case is therefore not mooted. The Supervisor's regulation is not aimed at gambling, *per se.* It does not purport to make the activity defined in the regulation either lawful or unlawful nor to attach any penalty thereto. The regulation is aimed rather at the control of the licensed alcoholic beverage-selling business. The privilege of selling alcoholic beverage is conditional, *Peppermint*

*Lounge, Inc. v. Wright,* 498 S.W.2d 749, 752 (Mo.1973); *Pinzino v. Supervisor of Liquor Control,* 334 S.W.2d 20, 27 (Mo.1960), and one of those conditions is that a certain activity, which has a demonstrated attraction to draw people into the licensed premises where they are likely to purchase the merchandise offered therein, shall not be allowed by the licensee upon the licensed premises. This is an entirely legitimate objective and area for the Supervisor's regulation, a point which we will develop more fully under the heading "Supervisor's authority to promulgate Regulation 15(k)," *infra.* That the activity may be gambling, or may resemble gambling, whether lawful or unlawful, is merely incidental. The activity which is described in the regulation may be conducted without interdiction [2] by the Supervisor's regulation—but the business of alcoholic beverage sales cannot be conducted on the same premises. It was not the legislature's intent by the Criminal Code to reduce the Supervisor's regulatory powers over the licensed business of alcoholic beverage sales.[3]

The protection of an activity—in our case, gambling, protected by § 372.100 from regulation by agencies and governmental subdivisions—does not reduce the boundaries of the Supervisor's statutory power to regulate *the sale of alcoholic beverages.* This is true even though the indirect or tangential effect of the regulation, as a practical consequence, may be to limit the places where the protected activity is actually carried on. The principle is recognizable in *California v. LaRue,* 409 U.S. 109, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972) where the Supreme Court of the United States considered a regulation of the California Department of Alcoholic Beverage Control which prohibited certain lewd sexual acts and displays, and the exhibition of porno-

1. The court is not bound by any stipulation of law. *Midella Enterprises v. Mo. State Hwy. Com'n,* 570 S.W.2d 298, 301 (Mo.App.1978).

2. We assume but do not decide that the plaintiffs' games are not unlawful since the adoption of the August 8, 1978, Amendment to Article III, § 39, Mo.Constitution of 1945.

3. This is not to say, of course, that the legislature could not, if it chose to do so, remove from the Supervisor this or any other area of regulation. The point is, it has not done so by the general preemption statute upon which the respondent relies.

graphic films, in places licensed for the sale of liquor by the drink. The lower court had found that the regulations prohibited conduct which was allowable and protected under the First and Fourteenth Amendments to the United States Constitution, and that the regulations were therefore invalid. The Supreme Court of the United States reversed and held the regulations valid. The court said, ". . . While we agree that at least some of the performances to which these regulations address themselves are within the limits of the constitutional protection of freedom of expression, the critical fact is that California has not forbidden these performances across the board. It has merely proscribed such performances in establishments that it licenses to sell liquor by the drink . . . The department's conclusion, embodied in these regulations, that certain sexual performances and the dispensation of liquor by the drink ought not to occur at premises that have licenses was not an irrational one. Given the added presumption in favor of the validity of the state regulation in this area that the 21st Amendment requires, we cannot hold that the regulations on their face violate the Federal Constitution." 409 U.S. at 118, 93 S.Ct. at 397.

In a separate concurring opinion, Mr. Justice Stewart said: ". . . I should suppose, therefore, that nobody would question the power of California to prevent the sale of liquor by the drink in places where food is not served, or where dancing is permitted, or where gasoline is sold. But here California has provided that liquor by the drink shall not be sold in places where certain grossly sexual exhibitions are performed; and that action by the state, says the appellees, violates the First and Fourteenth Amendments. I cannot agree.

"Every state is prohibited by these same amendments from invading the freedom of the press and from impinging upon the free exercise of religion. But does this mean that a state cannot provide that liquor shall not be sold in bookstores, or within 200 feet of a church? I think not. For the state would not thereby be interfering with the First Amendment activities of the church or the First Amendment business of the bookstore. It would simply be controlling the distribution of liquor, as it has every right to do under the Twenty-first Amendment. On the same premise, I cannot see how the liquor regulations now before us can be held, on their face, to violate the First and Fourteenth Amendments." 409 U.S. at 119–120, 93 S.Ct. at 397–398.

*Declaratory judgment a proper remedy.*

█ We are confronted with a second preliminary question—whether the plaintiffs have chosen the right remedy in this declaratory judgment action. The defendant Supervisor of Liquor Control says that they have not, but says that § 311.700, RSMo 1978,[4] provides the exclusive procedure by which the validity of the Supervisor's rules, and their application to the promotional games under examination, may be tested.

Plaintiffs claim that this declaratory judgment action, brought under the authority of Supreme Court Rule 87.02(c) is the correct procedure. That rule reads as follows:

"*Declaratory Judgment in Respect to Rules.* The power of the courts of this state to render declaratory judgments shall extend to declaratory judgments respecting the validity of rules, or of threatened applications thereof and such suits may be maintained against agencies whether or not the plaintiff has first requested the agency to pass upon the question presented."

Neither party cites any cases in support of his position, although the subject has been dealt with in several Missouri cases, hereinafter discussed, and has engaged the labors of the scholars. Gifford, *Declaratory Judgments under the Model State Administrative Procedure Acts,* 13 Houston L.R. 825 (1976).

The plaintiffs claim that the defendant waived any objection to the declaratory judgment procedure in the trial court, not

4. Repealed effective August 13, 1978.

only by failing to object thereto but by implicitly acknowledging in his pleadings the propriety of the procedure. It must be admitted that the defendant did not pointedly challenge the procedure in the trial court, and his objection to it, to say the most for it, was cryptic. Plaintiffs say his trial court brief expressly joined in the request for a declaratory judgment, but we do not have that before us. However, in view of the fact that we have concluded for reasons hereafter set out, that the declaratory judgment procedure is a proper remedy, and in view also of the fact that at least two of our cases (*Ackerman v. City of Creve Coeur*, 553 S.W.2d 490, 491 (Mo.App. 1977); *American Hog Company v. County of Clinton*, 495 S.W.2d 123, 125 (Mo.App. 1973)) hold this to be a jurisdictional question, which cannot be waived by the parties, but which we must examine, even *sua sponte,* we will now consider the question on its merits:

In the situation in which the plaintiffs found themselves at the beginning of this lawsuit, the grocer plaintiffs were sponsoring the promotional games. They had advertised the games, which were actually in progress. The Supervisor of Liquor Control had not initiated any proceedings for the revocation or suspension of their retail liquor licenses, but had warned them that such proceedings would be initiated unless the games were stopped.[5]

The plaintiffs were in a dilemma. They must stop the games; or, if they believed they were within their legal rights to proceed with them, they could do so only at the risk of the suspension or revocation of their liquor licenses. True enough, the statute, § 311.700, *supra,* gave them a right to appeal to the circuit court any adverse decision of the Supervisor of Liquor Control— but pending the appeal, any suspension or revocation assessed by the Supervisor of Liquor Control would be in effect, for there is no provision for a stay of the Supervisor's decision pending appeal. Success in overturning the Supervisor's adverse decision would perhaps be only a Pyrrhic victory. And, of course, they might find when the appeals were finished that the Supervisor's revocation or suspension was the proper decision.

It is just such uncertainty as this that the declaratory judgment provision of Supreme Court Rule 87.02(c) is designed to settle. It enables a person faced with uncertainty of his rights to secure in advance a definitive ruling settling whether a given administrative rule which threatens him is valid and is applicable to his situation or activity. A case in point is *Bresler v. Tietjen*, 424 S.W.2d 65 (Mo.banc 1968). In that case the State Board of Optometry had adopted certain rules for the violation of which the plaintiffs were threatened with the loss of their optometrists' licenses. The plaintiff optometrists brought an action under the Uniform Declaratory Judgments Act, Chapter 527, RSMo 1978, challenging the validity of the rules. In holding that declaratory judgment was the proper remedy, as against the Board's argument that the plaintiffs were confined to the administrative remedies provided by the optometrists' licensure act, the court said: "In view of the general nature of the Declaratory Judgment Act, we are of the opinion that this is an appropriate action for a determination of the validity of such of the challenged rules as actually present a justiciable controversy. Plaintiffs are entitled to a determination which will terminate the uncertainty as to whether their manner of dealing with the optical companies constitutes grounds for revocation of their certificates

---

5. The first hearing in the case, July 15, 1977, was on a preliminary injunction ancillary to the declaratory judgment action, upon which the trial court enjoined the Supervisor from the enforcement of Regulation 15(k). Much of the evidence in this case was given on that hearing. The temporary injunction was the subject of an absolute writ of prohibition issued by this court. *State ex rel. Letz v. Riley*, 559 S.W.2d 631 (Mo.App.1977). The main case was heard on October 28, 1977, and the parties stipulated that the evidence on the earlier hearing could be considered in the main case. By the time of the second hearing the plaintiffs' stores had been cited by the Supervisor for violation of Regulation 15(k), but no hearing had been held thereon.

of registration under the provisions of § 336.110." 424 S.W.2d at 70.

In *Goodwill Advertising Company v. State Liquor Authority*, 40 Misc.2d 886, 244 N.Y.S.2d 322, 329 (1962), a case very much like the present one upon its facts, held upon a consideration of the same arguments that declaratory judgment was a proper remedy. The court noted that a declaratory judgment would "quiet a disputed jural relation involving only questions of law, and where other forms of action are not reasonably adequate."

Section 311.700 provides for no advance judicial determination of the validity of the Supervisor's rules or their applicability to plaintiffs' games. While the section does say that "any party to the proceedings who is aggrieved by any final decision, finding, *rule* or order of the supervisor may file with the supervisor of liquor control his application for a review within fifteen days after notice of such decision shall have been mailed to said party" (our italics), and proceeds to set out an appeal procedure, the whole section contemplates a contested case or proceeding of some description. It is plainly inapplicable to any advance declaration of the validity of the rule under examination here, or its applicability to plaintiffs' promotional games. Plaintiffs could have a determination of those questions under § 311.700 only by continuing with the suspect promotional games at the risk of the temporary or indefinite loss of their licenses.

The rule under attack by plaintiffs was filed February 8, 1973, effective February 18, 1973. If the adoption of the rule could be said to be a "proceedings", as used in § 311.700, then the plaintiffs, in order to appeal therefrom, must have been a "party" to the proceedings and must have been "aggrieved" by the rule. If the plaintiffs were in existence at the time of the rules adoption, it is unlikely that they then contemplated the sponsorship of the games which we have under examination. They could not have been "aggrieved" by the

adoption of the rule. If they were not "parties" they would not be notified of the rule. In short, the procedure of § 311.700 is simply not suited to the advance settlement of the controversy between the plaintiffs and the defendant Supervisor.

We hold, therefore, that § 311.700 provided no statutory procedure for the advance determination of the validity of the rules promulgated by the Supervisor of Liquor Control, or the threatened application thereof, and therefore the declaratory judgment provision of Supreme Court Rule 87.-02(c), involving in this case only questions of law upon admitted facts, is an available remedy to plaintiffs. The trial court had jurisdiction of the case and so does this court.

The conclusion we have reached is not inconsistent with such cases as our own recent case of *Jefferson Lines, Inc. v. Missouri Public Service Commission*, 581 S.W.2d 124 (Mo.App.1979), or with *Union Electric Company v. Clark*, 511 S.W.2d 822 (Mo.1974), both cases involving Public Service Commission rules, wherein the courts noted that § 386.510, RSMo 1978, in each case provided a procedure for determining the validity of the rules in question without first having violated them and having incurred the risk of the imposition of sanctions therefor.

Neither does our present holding conflict with *American Hog Company v. County of Clinton, supra*, for that was a declaratory judgment case in which the plaintiff had gotten an unfavorable result in a contested case before the county zoning board. Instead of following the statutory appeal procedure provided in such cases, the plaintiff initiated the declaratory judgment action which was before this court. The court remanded the case with directions to dismiss plaintiff's petition on the ground that the statutory appeal route was exclusive and that the court had no jurisdiction to entertain the declaratory judgment action. The court pointed out: "With regard to § 536.050,[6] declaratory judgments are au-

---

6. Supreme Court Rule 87.02(c), under which the present case is brought, is drawn verbatim

from § 536.050, RSMo. 1978, a part of our Administrative Procedure and Review Act.

thorized thereunder respecting the validity of an administrative 'rule' or a threatened application thereof. The term 'rule' is specially defined in § 536.010(4) [V.A.M.S. (2)] as including every regulation 'of general application and future effect'. The definition in that subsection (4) [V.A.M.S. (2)] stands in contrast to the definition of 'contested case' in subsection (2) [V.A.M.S. subsection (3)] which is defined as 'a proceeding before an agency in which legal rights, duties or privileges of specific parties are required by law to be determined after hearing; * * *' These definitions are substantially identical to those set forth in Rule 100.01." 495 S.W.2d at 126. This statement from Judge Wasserstrom's opinion points up the distinction between that case and the present one. That was a "contested case"; ours deals with "the validity of an administrative 'rule' [and the] threatened application thereof".

*Gambling and consideration.*

We now reach the substantive issues in the case.

The trial court, as we noted at the outset, found as a matter of law that plaintiffs' games did not violate Rule 15(k), quoted earlier. This finding the Supervisor challenges on this appeal, a challenge which must be sustained.

Respondents, defending the judgment of the trial court, say that their games do not constitute the gambling condemned by this regulation because the player does not stand to *lose* "money, trade checks, prizes, merchandise or property", or similar consideration. They say that by the rule of *ejusdem generis*, the phrase "any other consideration whatsoever" as used in this regulation, is limited to consideration of the character of the items specifically named. They say that the consideration flowing from the player to the sponsoring store does not constitute that kind of consideration, so as to bring the game within this regulation. And, respondents add, although a player does stand to *win* money (an included kind of consideration), since he does not stand to

*lose* the kind of consideration required by this regulation, then the regulation is not violated. So the argument proceeds.

We cannot agree with the respondents that the rule should be so interpreted, and we find that the games were in violation of the Supervisor's Liquor Regulation 15(k).

That the scheme described in the evidence constitutes "gambling" in the classical sense would be hard to gainsay. It includes the elements of prize, chance and consideration. *Mobil Oil Corp. v. Danforth*, 455 S.W.2d 505, 507 (Mo. banc 1970); *State v. McEwan*, 343 Mo. 213, 120 S.W.2d 1098 (1938). That the scheme calls for a consideration, in the classical sense, flowing from the player to the sponsoring store is rather plain. *Mobil Oil Corp. v. Danforth, supra; State v. McEwan, supra; State v. Fox Kansas Theatre Co.*, 144 Kan. 687, 62 P.2d 929, 934 (1936). The store desires members of the public to come upon their premises where their merchandise is offered for sale. Their advertisements invite the public to participate. So they sponsor and advertise the promotional games. The total direct and indirect cost of sponsorship is not shown by the record before us, but one of the advertisements of an I.G.A. store, associated with the plaintiff Wetterau, appearing in a Kirksville newspaper for Wednesday, June 15, 1977, says that the cash prizes total $250,000. Apparently there were 151 I.G.A. stores located in Missouri and southeastern Iowa who were sponsoring the Gamerama game at that time. A June 5 ad in the *Kansas City Star* advertised $100,000 in cash prizes to be won in Gamerama sponsored by Fleming related stores in central and western Missouri and in Johnson County, Kansas. These figures do not include, of course, the cost of advertising and the cost of game materials, royalties and other expenses connected with the program. Witnesses for the three original plaintiffs, who had been running the games from four to five weeks, estimated total expenses, to that time, of $325,000. The games would ordinarily run about 13 weeks.

Members of the public responded in the desired manner. They came to the plaintiffs' stores in larger numbers. They increased their purchases, swelling the plaintiffs' sales volumes. Stipulated evidence shows, with respect to intervenor Gerbes Super Markets, Inc., which sponsored a game called "Instant Money": "For the period of June 13 to June 19, 1977, Intervenor's gross sales were 0.48% less than the comparable week in 1976. Four weeks later, for the period July 11 to July 18, 1977, Intervenor's gross sales had deteriorated to a point where they were 11.28% less than the comparable week in 1976. During the period beginning June 6 and ending August 14, 1977, Intervenor experienced a customer count decrease of 7.92% and a gross sales decrease of 6.80% under the comparable period in 1976. Conversely, and reflecting commencement of its promotion effective August 17, 1977, Intervenor experienced an increase in its customer count from August 15 to October 23, 1977, of 16.57% and a corresponding increase in gross revenue of 11.61% over the comparable period in 1976. Intervenor's promotion has resulted in an increase in gross revenues from August 15 through October 23, 1977, of 11.61% over the comparable period in 1976 and an increase in Intervenor's customer count of 12.48% over the same comparable period. As a measure of the effectiveness of Intervenor's promotion the customer count for the ten week period from August 15 through October 23, 1977, was 16.57% over the customer count for the ten week period from June 6 to August 14, 1977, and the corresponding increase in gross revenues was 13.55%."

Plaintiffs A & P, Fleming Foods, and Wetterau experienced a 16% increase in customer count during the games, and a 9% increase in gross revenues.

The players, on the other hand, performed their part of the bargain by going through the prescribed procedure for securing game cards and game checks, matching the markers with the spaces on the game cards. If they qualified for a prize, they would go through the prescribed procedure to claim the prize. They would allow their names and addresses to be posted in participating stores. More than 99% of them visited the stores to get their game pieces, and only 1% of them got them by mail or phone.

Under *McEwan, Mobil Oil* and *Fox Kansas Theatre Co., supra,* there was certainly sufficient consideration flowing from player to store to constitute the games a species of "gambling", as that term is used in Regulation 15(k).

The rule of *ejusdem generis,* upon which respondents rely for their interpretation of this regulation, and which was applied by the trial court to give the term "consideration" a much narrowed meaning, is simply a tool for the ascertainment of legislative intent. "Where general words follow specific words in an enumeration describing the legal subject, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words." 2A Sutherland, Statutory Construction, § 47.17 (4th ed. 1973). The tail does not wag the dog, however, and the rule yields to indication of the contrary intent or purport. We find in the Supervisor's Regulation 15(k) an intent that the "consideration" be given its broader meaning, not limited by the enumerated types of consideration which precede it. We find this intent from the emphasis upon inclusiveness in the language employed—"any other consideration *whatsoever*" (emphasis supplied). *City of St. Louis v. Bowler,* 94 Mo. 630, 7 S.W. 434, 435 (1888); *State v. Brackman,* 260 S.W.2d 800, 813 (Mo.App. 1953). The idea of inclusiveness is sounded in the regulation language which takes in "gambling . . . of any kind or character whatsoever". We hold that the regulation is sufficiently broad to cover the kind of consideration present here, and therefore broad enough to cover plaintiffs' games.

*Supervisor's authority to promulgate Regulation 15(k).*

The respondents argue that the Supervisor of Liquor Control does not have the authority to promulgate such a regulation as is now under consideration, if the regulation be interpreted to cover such games as

these, where the "consideration" is something other than "money or its equivalent". They argue that the Supervisor of Liquor Control is limited by the "legislative policy" as expressed in § 563.430, RSMo 1969, and that the Supervisor's regulation with respect to gambling on licensed premises could not be any broader than that statute. § 563.430 which defines and punishes the establishment of a lottery, provides by amendment added in 1963 that "this section shall apply only where there is consideration in the form of money or its equivalent, paid to or received by the person awarding the prize."

We note first, however, that in the only case which has considered the effect of the cited language, *Mobil Oil Corporation v. Danforth, supra,* it was held that the General Assembly did not intend to abrogate the holding of *State v. McEwan, supra,* which had held the element of consideration was present in a "bank night" scheme at a theater, even though a person was not required to purchase an admission ticket but could simply walk in and register in order to be eligible for a prize. To hold otherwise, the court said, would ascribe to the General Assembly an intention to assume the power, belonging exclusively to the judiciary, to define lotteries under Article III, Section 39(9), of the Constitution of Missouri (1945), which read at that time as follows: "Section 39, the General Assembly shall not have power: * * * (9) to authorize lotteries or gift enterprises for any purpose, and shall enact laws to prohibit the sale of lottery or gift enterprise tickets, or tickets in any scheme in the nature of a lottery."

In *Mobil Oil* a scheme in its main features much like those now under consideration was held to be in violation of the above § 563.430.

Regardless of the meaning and effect of § 563.430, though, and whatever the legislative policy may be with respect to *gambling* as a crime, what we are here concerned with is alcoholic beverage control. Our inquiry is whether the Supervisor's regulation is consistent with the legislative purposes expressed in the Liquor Control Law, § 311.010, *et seq.,* RSMo 1978, and whether it is reasonably calculated to serve a legitimate purpose expressed by the Law. We have concluded that question must be answered in the affirmative, for reasons hereafter discussed.

The power of the Supervisor to make the regulation now under consideration must be found, if at all, in § 311.660, which provides: "The supervisor of liquor control shall have the authority . . . to make the following regulations, without limiting the generality of provisions empowering the supervisor of liquor control as in this chapter set forth as to the following matters, acts or things: . . . (6) establish rules and regulations for the conduct of the business carried on by each specific licensee under the license, and such rules and regulations if not obeyed by every licensee shall be grounds for the revocation or suspension of the license; . . . (10) to make such other rules and regulations as are necessary and feasible for carrying out the provisions of this chapter, as are not inconsistent with [the] law."

In considering the validity of the regulation as a valid exercise of the Supervisor's authority, we remember the well-established rule that "rules and regulations are to be sustained unless unreasonable and plainly inconsistent with the Act, and they are not to be overruled except for weighty reasons . . . the burden is upon those challenging the rules to show that they bear no reasonable relationship to the legislative objective." *Brown-Forman Distillers Corporation v. Stewart,* 520 S.W.2d 1, 11 (Mo. banc 1975).

In *Milgram Food Stores, Inc. v. Ketchum,* 384 S.W.2d 510, 513 (Mo.1964), in which a regulation was upheld which prohibited a retail liquor licensee's advertising any premium as an inducement to purchase intoxicating liquor, the court said that the limitation of subsection (10) of § 311.660 that the Supervisor's rules and regulations be " 'necessary, reasonable and consistent with this law' " applies not only to subsection (10) but also to the other nine subsections including subsection (6). The Supervisor may make

rules and regulations " '[as are necessary and feasible (reasonable) for carrying out the provisions of this chapter, as are not inconsistent with this law] . . .' "

In *Brown-Forman Distillers Corporation v. Stewart, supra,* at 10, it is said: "Appellants further challenge to Regulation 4(g) is also unavailing. The broad yet valid authority conferred upon the Supervisor by subsections (6) and (10) of § 311.660 is limited only in the respect that regulations be necessary, reasonable, and not inconsistent with the Liquor Control Law. *Milgram Food Stores, Inc. v. Ketchum, supra.*"

In *Milgram Food Stores,* the court had under scrutiny a regulation which prohibited in any advertisement of intoxicating liquor " 'any statement offering any coupon, premium, prize or rebate as an inducement to purchase intoxicating liquor' ". 384 S.W.2d at 511. The license of a liquor licensee was suspended for violation of that regulation, and the licensee challenged the authority of the Supervisor to make such regulation. Judge Hyde pointed out § 311.-350, RSMo 1969, making window displays of intoxicating liquor unlawful, and § 311.360, prohibiting misrepresentation of brands sold or offer of substitution of liquor of one manufacturer for that of another, "does show some indication of policy to limit inducing sales by advertising, especially the prohibition of window displays. Furthermore, Regulation 15(f)(5) concerns not only advertising but stimulating sales by offers of a prize or premium in an advertisement . . . It has been held proper to regulate advertising of liquor to discourage artificial stimulation of liquor consumption . . ." (Citations omitted.) Then, quoting from *Commonwealth v. Anheuser Busch, Inc.,* 181 Va. 678, 26 S.E.2d 94, Judge Hyde said: " 'The police powers of the state with reference to the control of intoxicating liquors is to be distinguished from its powers to regulate traffic in other things. It would be different if the business sought to be followed was one of the ordinary pursuits in which all persons are enabled to engage . . . To unduly encourage, by display advertisements throughout the state, the use of alcoholic stimulants, or to stimulate that use, is highly undesirable.' " 384 S.W.2d at 513. *See also Zinn v. City of Steelville,* 351 Mo. 413, 173 S.W.2d 398 (banc 1943). Annot., "Construction and Application of Statutes or Ordinances Respecting Amusements on Premises Licensed for Sale of Intoxicating Liquor", 4 A.L.R.2d 1216 (1949).

In addition to a discernible legislative purpose to prevent what the Virginia court called the "artificial stimulation of [alcoholic] beverages consumption", we find also in the Liquor Control Law a legislative purpose to separate the business of selling alcoholic beverages from various species of unlawful activity. Note § 311.680, which provides for suspension or revocation of the liquor license where the dealer "has not at all times kept an orderly place or house"— and § 311.710, which provides for revocation or suspension of retail liquor licenses by the circuit court for "permitting on the licensed premises any disorderly conduct, breach of the peace, or any lewd, immoral or improper entertainment, conduct or practices". The games carried on by the plaintiffs were felonies before August 8, 1978, during the time with which we are concerned in this case. § 563.430, *supra.*

*Conclusion.*

We have held that the games described in evidence, distributed by plaintiffs Glendinning Companies and Dansico, and sponsored by plaintiffs A & P, Fleming Foods and Wetterau, and by intervenor Gerbes, were in violation of Regulation 15(k) of the Supervisor of Liquor Control; that the regulation was within the statutory authority of the Supervisor to promulgate, and to enforce, and continues to be valid and enforceable notwithstanding § 572.100, RSMo 1978.

The judgment of the trial court is reversed and the cause is remanded for the entry of a judgment consistent with this opinion.

All concur.